UNITED STATES of America

v.

CITY OF BEAUMONT and
State of Texas.

No. B:89–0873–CA.

United States District Court,
E.D. Texas,
Beaumont Division.

Feb. 19, 1992.

Steven Novick, Trial Atty., U.S. Dept. of Justice, Environmental Enforcement Section, Washington, D.C., for plaintiff.

Lane Nichols, City Atty., Beaumont, Tex., Robert H. Lloyd, Lloyd, Gosselind, Ryan & Fowler, Austin, Tex., for City of Beaumont.

Mary Francis Keller, Atty. Gen., Austin, Tex., for State of Tex.

## MEMORANDUM OPINION

COBB, District Judge.

On October 3, 1989, the United States of America filed this civil lawsuit against the City of Beaumont and the State of Texas, alleging the City of Beaumont had failed to properly implement a required pretreatment program for wastewater, in violation of the terms of its National Pollutant Discharge Elimination System (NPDES) permit. The suit seeks relief under 33 U.S.C. § 1319(d), providing civil penalties for violations of the terms of NPDES permits. Trial was had to the court. The court now enters the following findings of fact and conclusions of law.

## FINDINGS OF FACT

*History of the Program*

1. In May 1980, EPA Region VI, pursuant to Section 402 of the Clean Water Act, issued a National Pollutant Discharge Elimination System (NPDES) permit to the City of Beaumont, governing discharges of wastewater from Beaumont's Publicly Owned Treatment Works (POTW), which, *inter alia,* required the City to develop and submit an approvable Pretreatment Program.

2. The City developed a Pretreatment Program, which EPA approved by letter dated December 23, 1983.

3. The Pretreatment Program provided that the City would, *inter alia:*

(a) "Upon approval of the Program," complete a comprehensive analysis of the wastewater of the Industrial Users (IUs) identified as "major IUs" by the Pretreatment Program, and determine if any of those "major IUs" discharged effluent which had the potential to interfere with the operation of the City's Publicly Owned Treatment Works ("POTW");

(b) Identify significant industrial dischargers;

(c) Issue permits to significant industrial dischargers;

(d) Require all significant industrial dischargers to submit self-monitoring reports on a semiannual basis;

(e) Enforce local limits contained in the City's Industrial Waste Ordinance against the IUs;

(f) Publish annually, in the city's largest newspaper, a list of all significantly violating IUs.

4. On December 23, 1983, EPA Region VI wrote to the City informing the City that the Program had been approved, and that its NPDES permit had been modified to (a) incorporate the Program by reference and (b) to provide that the City was required, as a condition of the NPDES Permit, to implement the approved Pretreatment Program.

5. Also, on December 23, 1983, EPA reissued the City's NPDES permit. The revised NPDES permit incorporated the Pretreatment Program by reference, required the City to implement the Program, and provided that the City would submit to EPA its first list of significantly violating IUs in December 1984.

6. The City did not complete the "comprehensive sampling and analysis program" until 1987.

7. From approximately February 1984 to at least August 1984, the sampling equipment which was to be used to complete the "comprehensive analysis" was being used for some other purpose and was unavailable to continue the comprehensive analysis.

8. Robert Burrows, the City employee responsible for administration of the Pre-treatment Program during 1984, did not at any time request that the sampling equipment be made available for completion of the Comprehensive Analysis.

9. In or about August 1984, Robert Burrows became head of the Water Production Department. His involvement in the administration of the Pretreatment Program from that point on was minimal.

10. The City did not identify significant industrial dischargers in 1984 as required.

11. The City did not issue industrial waste permits to any significant industrial dischargers in 1984 as required.

12. The City did not require significant industrial users to submit self-monitoring reports in 1984 as required.

13. The City took absolutely no enforcement action against any significantly violating industrial users in 1984, either for violation of local limits or any other type of violation.

14. The City did not publish a list of significantly violating industrial users in 1984 as required.

15. From August 1984 to March 1987, the position of Industrial Waste Control Superintendent, to which the responsibility of operating the Program had been assigned, remained vacant.

16. Although the City has claimed that Marion Foster shared responsibility for administering and implementing the Pretreatment Program during the period 1984–1986, Marion Foster has denied that she ever saw the Pretreatment Program prior to November 21, 1990, and in fact was not familiar with, and was neither asked to, nor attempted to implement, the provisions of the Program.

17. In 1985, the City did not identify Significant Dischargers as required.

18. In 1985, the City did not issue permits to any Significant Dischargers as required.

19. In 1985, the City did not require any IUs to perform self-monitoring or submit self-monitoring reports.

**636**

20. In 1985, the City took absolutely no enforcement action against any IUs, either for violations of the local limits or any other violations of Program conditions.

21. In 1985, the City did not publish a list of significantly violation IUs.

22. In October 1985, EPA Region VI conducted an audit of the City's Pretreatment Program.

23. The auditors concluded that the City had failed to implement any aspect of the Program.

24. In May 1986, EPA Region VI issued Administrative Order No. VI–86–903 to the City. The AO required the City, *inter alia*, to, by September 1, 1986, take formal enforcement action against all significantly violating IUs, and by December 1, 1986, issue permits to all major IUs.

25. As of December 31, 1986, the City still had not identified Significant Dischargers as required.

26. As of December 31, 1986, the City still had not issued permits to any Significant Dischargers as required.

27. In 1986, the City did not require IUs to conduct self-monitoring or submit self-monitoring reports.

28. In 1986, the City did not take any enforcement action against significantly violating IUs.

29. In 1986, the City did not publish a list of significantly violating IUs.

30. On March 9, 1987, the City hired Jim Williams as Industrial Wast⁻ Control Supervisor. The City finally began implementation of the Program when Williams was hired.

31. Within four months of his hiring, Mr. Williams was able to inspect many of the City's major IUs, initiate correspondence with many of the IUs, inform them of the responsibilities they could expect to assume under the Program, and even suggest changes to their operations.

32. Williams concluded, however, that prior to March 1987, the IUs had not been informed of their responsibilities under the Pretreatment Program, specifically the self-monitoring requirements of the Program.

33. In fact, as of March 1987, the IUs were *not* familiar with their responsibilities under the Pretreatment Program; specifically, they were *not* familiar with the self-monitoring requirements of the Program.

34. Williams also concluded that as of March 1987, the City did not have sufficient data on the waste discharges from its IUs to be in a position to issue industrial waste permits to significant IUs.

35. In a June 4, 1987, letter to EPA Region VI, S.A. Webb stated that the City was "reluctant" to enforce the limits established by the City's Industrial Waste Discharge Ordinance against its IUs, and indicated that the City still had not informed its IUs of their responsibilities under the Program.

36. Prior to June 1987, the City made no effort to enforce its local limits against IUs.

37. The provisions of the Pretreatment Program which the City began implementing in 1987 were provisions which had been in the Program since 1983.

38. Prior to 1987, there were a number of IUs discharging wastewater to the POTW whose wastewater contained substances which, by composition or concentration, could cause interference with the City's wastewater collection or treatment system.

39. The City did not issue any permits to significant dischargers, or require IUs to begin self-monitoring, until 1988. It did not publish its first list of significantly violating IUs until December 1988.

40. By January 20, 1988, the City had identified 24 industrial dischargers as "significant."

41. Nineteen of the 24 industrial dischargers which the City identified as "significant" in 1988 had been on the list of 52 major dischargers identified in the 1983 program submission, but had been operating without permits from 1983 to 1988. The City concluded that the nature of the wastewater discharged by many of these IUs was such that it posed a danger of

pass-through of pollutants through the POTW, sludge contamination, damage to the City's wastewater collection system, and inhibition.

42. Identifying significant dischargers is an important aspect of the Pretreatment Program. It is not an "unessential bureaucratic function."

43. Issuing permits to significant dischargers is an important part of the Pretreatment Program. It is not an "unessential bureaucratic function."

44. The self-monitoring requirements of the Program are an important part of the program. Requiring IUs to perform self-monitoring is not an "unessential bureaucratic function."

45. Identifying significantly violating IUs, and publishing a list of such significantly violating IUs in the newspaper, is an important aspect of the Program, and is not an "unessential bureaucratic function."

46. The City finally identified and published lists of significantly violating IUs in 1988 and 1989.

*Significant Discharges; Waste Characteristics*

47. Seven of the significant dischargers which the City ultimately identified are dischargers which the City refers to collectively as "tank truck haulers," "chemical tank truck companies," or "chemical transporters."

48. The tank truck haulers handle and discharge a wide variety of wastes, and the volume and chemical composition of such discharges can change drastically from day to day. This was true in 1983 and is true now.

49. The tank truck haulers' effluent has included pollutants designated as toxic by EPA, including cyanide; may have included placarded poisons; and has included toxic pollutants which are soluble in water and thus capable of passing through the POTW undetected.

50. Jim Williams required all tank truck haulers to institute a "batch" discharge system and to sample each batch prior to discharge to the sewer system. Prior to the institution of this system, the City did not and could not know the composition of any chemicals the tank truck terminals were discharging into the sewer system.

51. Prior to institution of the batch discharge system, the tank truck haulers relied on "API separators" to pre-treat their wastewater. At least some of the tank truck terminals had ineffective API Separators.

52. From 1983 to 1987, one of the City's IUs was Beaumont Plating, an electroplater subject to EPA "categorical" dischargers and would enforce EPA standards against such dischargers. In fact, City officials recognized that failure to issue such permits and enforce such standards would be a violation of the City's NPDES Permit. However, from 1983 to 1987, Beaumont Plating discharged wastewater to the sewer system without a permit, and the City made no effort to enforce EPA standards against Beaumont Plating. When the City sampled Beaumont Plating's wastewater in 1987, it found that Beaumont Plating was in violation of EPA standards. It is virtually certain that Beaumont Plating was in violation of EPA standards during the whole period 1983–87.

*Cost of Operating the Program*

53. It has cost the City approximately $100,000 per year to operate its Pretreatment Program in 1987, 1988, and 1989. It is likely that it would have cost the City approximately $100,000 a year (discounted for inflation) to operate its Pretreatment Program during the period 1984–87, if the City had chosen to implement its Program. Thus, it is reasonable to estimate that the City saved at least $316,000 by its failure to make any effort to implement the Program over a period of three years and two months.

*City's Investment Loans*

54. As of March 1985, the position of Industrial Waste Supervisor (to which the responsibility for operating the Program was assigned) had been vacant for seven months; the City had not completed the "comprehensive analysis"; the City had not identified significant dischargers; and the

City had not issued permits to significant dischargers.

55. In March 1985, the City suffered an investment loss of approximately $20 million.

56. As a result of the $20 million loss, the Water Utilities Department (the City department responsible for implementing the Pretreatment Program) reduced its staff from 180 to 149. In general, reductions in specific divisions of the Department were conducted after an effort was made to identify priorities and retain personnel necessary for high-priority functions.

57. There was, however, no discussion within the Water Utilities Department of whether the Pretreatment Program was a high-priority program which should be maintained despite the cuts in funding.

58. After cuts resulting from the $20 million loss were implemented, the Water Utilities Department still had 149 employees; but not one of these employees was charged with the responsibility for implementing the Program.

59. In fiscal year 1985 alone, the Water Utilities Department's operating revenues exceeded operating expenses by over $4 million.

60. In fiscal year 1985, the Water Utilities Department proposed a rate increase which was approved.

61. In April 1986, the City projected that it would have a positive General Fund balance by the end of the year.

62. The City's 1985 investment loss was not the primary reason, nor even a significant reason, for its failure to implement its Pretreatment Program prior to March 1987. This is apparent because of the fact that no effort on the part of the City to comply with the law was made in 1983, 1984, or 1985. In addition, the City made significant financial gains in the Water Department in 1985, and raised rate during that year.

*Environmental Harm*

63. Since the City failed to perform the sampling and monitoring required by the Program, information on the level of harm-ful pollutants which may have been discharged by the Beaumont POTW to the Hillebrandt Bayou is forever lost to environmental planners and policy makers and those who might undertake to remedy the effects of any pollution.

64. By failing to monitor its IUs or enforce local limits, the City took a substantial risk of interference with or damage to the POTW.

65. As a result of the City's failure to monitor or issue permits to, or enforce local limits against, significant and categorical IUs, significant quantities of toxic pollutants may have been discharged into the Hillebrandt Bayou, which may have resulted in environmental harm.

*Duration of Violations*

66. For purposes of determining the number of days that the City was in violation of its NPDES Permit requirement to implement the Pretreatment Program, the most conservative approach (*i.e.*, the approach most generous to the City), based on the undisputed facts, would be to count December 24, 1984 (the day the City's first list of significant violators was due) as the first day of violation and to count March 9, 1987, as the last day of violation. Thus, the City was in violation of this Permit requirement for at least 800 days.

## CONCLUSIONS OF LAW

1. The City's NPDES Permit, as modified on December 23, 1983, required the City to implement in its Pretreatment Program in full, and required that the Program be fully operational (*i.e.*, that the City would have identified and issued permits to Significant and Categorical Dischargers, instituted self-monitoring requirements, and begun enforcement of local limits) by December 24, 1984.

2. Section 402 of the Clean Water Act, 33 U.S.C. § 1342, and the Pretreatment Regulations at 40 C.F.R. Part 403 *et seq.* clearly authorize the Environmental Protection Agency to require full implementation of a Pretreatment Program as a condition of an NPDES Permit.

3. Section 509(b)(1) of the Clean Water Act, 33 U.S.C. § 1369(b)(1), provides that judicial review of the provisions of an NPDES Permit is vested in the Courts of Appeals, and that such review may only be had by application made within 120 days of the issuance of the Permit. Thus, the City of Beaumont, which failed to make any such challenge to the condition of its December 23, 1983, NPDES Permit requiring implementation of its Pretreatment Program, is absolutely precluded from challenging the validity of that provision in this enforcement section.

4. Section 309(d) of the Clean Water Act, 33 U.S.C. § 1319(d) mandates that civil penalties be imposed for violations of conditions of NPDES Permits. The statute sets no minimum penalty, but the maximum formerly was $10,000 (now $25,000 since the amendment) for each violation, and each day is stated by Congress to be a separate violation. The Government's attorney has urged the court is warranted in imposing the full $8,000,000 as a penalty, or at least a substantial portion thereof.

5. Section 309(d) details factors to be considered by the courts in determining the amount of such penalty awards. Those factors are: the seriousness of the violation or violations, the economic benefit (if any) resulting from the violation, any history of such violations, any good-faith efforts to comply with the applicable requirements, the economic impact of the penalty on the violator, and such other matters as justice may require.

6. Based on the facts of this case, and the factors enumerated by the statute, a penalty award of $400,000 is appropriate.

7. No injunctive relief is granted, as the City is now in compliance.

Judgment is to be submitted by the plaintiff, in its favor, in the amount of $400,000.

All costs are taxed against the defendant.