**UNITED STATES of America, Plaintiff,**

v.

**Frank J. KELLEY, Attorney General, Frank J. Kelley, ex rel., Michigan Air Pollution Control Commission, Michigan Natural Resources Commission, and Dr. Gordon Guyer, Director of the Michigan Department of Natural Resources, Intervening Plaintiffs,**

v.

**MONITOR SUGAR COMPANY, Defendant.**

Civ. A. No. 85–CV–10309.

United States District Court,
E.D. Michigan, S.D.,
Flint.

Jan. 7, 1993.

Michael J. Hluchaniuk, Asst. U.S. Atty., Fay City, MI, Susan L. Schneider, Dept. of Justice, Washington, DC, Suzanne Glade, U.S. E.P.A., Region V, Chicago, IL, Steven E. Chester, Asst. U.S. Atty., Lansing, MI, for plaintiff.

Glenn F. Doyle, Bay City, MI, for defendant.

## MEMORANDUM OPINION AND ORDER

NEWBLATT, District Judge.

Pending before the Court is the Motion of the United States and the State of Michigan to hold Monitor Sugar Company ("Monitor" or "the Company") in civil contempt and to assess stipulated penalties for a determination of the appropriate damages award for Monitor Sugar's failure to abide by the terms of the 1987 consent decree (signed by the Court on December 10, 1987, hereinafter "consent decree" or "consent judgment", and paragraphs of this document shall be denoted with the ¶ symbol).

I. Preliminary Issues [1]

A. *Special Master*

The Court finds that a special master is not appropriate in this matter because all issues are capable of resolution by the Court on the evidence before it. Any factual disputes remaining unresolved by this Order shall be addressed at an evidentiary hearing.

B. *Legal Authority of this Court to Enforce the Consent Decree*

■ A consent decree is both a judgment of the court and a contract between the parties. *Local Number 93, International Assoc. of Firefighters v. Cleveland,* 478 U.S. 501, 519, 106 S.Ct. 3063, 3073, 92 L.Ed.2d 405 (1986). This Court has retained jurisdiction over the Consent Judgment, ¶ 44. In addition, Fed.R.Civ.P. 70 expressly authorizes a court to adjudge in civil contempt a party that fails to comply with a judgment of the court requiring performance of a specific act. Oral argu-

---

1. The factual backdrop to this case has been made clear by all parties and in prior rulings by this Court.

ment was heard on several of the issues arising from the consent judgment violations on September 14, 1990.

## II. Opacity Limit Violations For Sugar Campaigns: 1988–89, 1989–90

Section V, ¶ 14 of the Consent Judgment provides that "Monitor shall achieve, demonstrate and maintain compliance at all times with the [Clean Air] Act and the Michigan Air Pollution Control Commission [MAPCC] Rules 336.1301(1)(a) and 336.1331 of the Michigan SIP at the stack serving boilers 1, 2 and 3." MAPCC Rule 336.-1301(1)(a) limits visible emissions from fuel burning sources to a six minute average of 20 percent opacity, except for one six-minute period of not more than 27 percent opacity. Page 7 of the Plaintiff's Memorandum of August 27, 1990 lists data supplied by Monitor that shows visible emissions in violation of MAPCC Rule 336.1301 and the stipulated penalties pursuant to ¶ 29(a) of the Consent Judgment. Monitor disputes neither the occurrence of the emissions, nor the calculation of the stipulated amount, $98,000.00.

■ Plaintiffs have filed a supplemental complaint that seeks penalties for similar violations during the 1989–1990 sugar campaign. The penalties sought for that campaign's eight opacity violations are $38,500. *See* Supplemental Motion of the United States and the State of Michigan For an Order to Show Case Why Defendant Should Not be Held in Civil Contempt and for the Assessment of Stipulated Penalties at 3 (filed August 27, 1990). Thus, the combined penalties for opacity violations are $136,500.

Monitor claims the force majeure clause in the consent decree requires it to pay penalties for circumstances beyond its control, such as "those occasions where mechanical breakdown or other reasonably unforeseeable events caused equipment not to function to design parameters." In particular, the coal-fired boiler broke down during the sugar campaign, and the startup of it afterwards resulted in the release of "high opacity particulate matter." Memorandum in Opposition to Motion, filed September 24, 1990 at 3–4. Monitor claims that this problem was beyond its control, and cites the force majeure clause of the Consent Judgment, Section VIII, ¶¶ 24–28.

The key provisions of the force majeure clause state:

24. Monitor's failure to achieve or maintain timely compliance with any requirement of this Consent Judgment may be excused pursuant to this Section only to the extent that such failure is caused solely by circumstances beyond its control.

＊　　＊　　＊　　＊　　＊　　＊

28. * * * The burden of proving that any failure to achieve or maintain timely compliance was caused solely by circumstances beyond the control of the Monitor shall rest with Monitor. Economic hardship or increased costs shall not constitute circumstances beyond Monitor's control.

Consent Judgment.

The Plaintiffs' position, supported by affidavits, *see* Affidavits of Brenda Brouillet and Mark Reed, is that Monitor could have installed "preheaters" that would have prevented the opacity exceedences. Plaintiff's Memorandum of August 28, 1990 at 9. Moreover, MAPCC Rule 336.1301(1)(a) provides no exception for boiler startups. On one occasion, October 24, 1988, Plaintiffs claim the shut-down was caused by poor maintenance. *Id.*

Monitor contends that the startup exceedences were impossible to avoid employing standard industry practices, and that it did not use poor maintenance of its boilers. Its position is also supported by affidavits. *See* affidavit of William Stephenson. Therefore, it claims that the force majeure clause applies to the dispute.

At oral argument, this Court stated, "A contract is a contract is a contract, and if the language is unambiguous I have no choice not to apply that language." Court Tape Record of September 14, 1990. This Court has previously analyzed the force majeure clause in the Order of August 16, 1991. The Court stated in that Order, "Circumstances beyond one's control has to

mean circumstances that arose after the Judgment or circumstances as to which the parties were neither aware nor capable of being aware." Order of August 16, 1991 at 7. Circumstances as to which the parties were not capable of being aware is, in essence, a foreseeability standard. If the grounds for the emissions were foreseeable to Monitor at the signing of the Consent Judgment, then Monitor must pay.

Mr. Stephenson's affidavit, submitted by Monitor, explains the contested emissions as falling into three categories: (1) cold starts at the beginning of the sugar campaign; warm starts, from shutdowns due to mechanical failure and cleaning fire grates; and (3) "near cold restarts" on October 24, 1988 and repeatedly in December, 1988 resulting from a shutdown due to sugar leaking into the boiler.

Under the Consent Judgment, the burden rests on Monitor to show that circumstances were entirely outside its control, ¶ 28, and this Court has found that foreseeable circumstances are not entirely outside Monitor's control. The need to start the boilers at the beginning of the campaign was certainly foreseeable. Therefore, the penalties apply to those emissions.

Maintenance difficulties with the boilers are also a foreseeable problem. Monitor was represented by competent counsel when it agreed to the stipulated penalties for violation of the consent judgment provisions. Had the parties intended for mechanical problems to provide Monitor with an excuse for noncompliance, the parties could have stated so in clear language. It is therefore irrelevant whether the *type* of mechanical mishaps that occurred are rare or typical, since some type of mechanical problems were foreseeable.

Mr. Stephenson's affidavit suggests that "cleaning grates", which accounts for several of the boiler shutdowns resulting in startups with resulting high opacity emissions is "typical," but that the mishap of October 24, 1990, in which sugar entered the boiler, was a unique occurrence.[2] The

legal significance of the shutdowns remains the same, however.

Monitor also cannot rely on the legal doctrines of impossibility or impracticability. Performance was neither impossible—Monitor clearly *could* have complied by keeping its boiler shut down—nor impracticable. *See Roth Steel Products v. Sharon Steel Corp.*, 705 F.2d 134, 149 (6th Cir.1983) (discussing requirements of commercial impracticability under the U.C.C. § 2–615, "Generally a party asserting the defense of commercial impracticability must prove that an unforeseeable event occurred, that the non-occurrence of the event was a basic assumption underlying the agreement, and that the event rendered performance impracticable."). Here, the possibility that mechanical difficulties would arise was clearly foreseeable.

From a policy standpoint, this outcome is the correct one as well. Each time Monitor decided to restart the machine after a shutdown, its management either knew or should have known that a high opacity emission could result. Those decisions were undoubtedly economically rational ones for the company to make, if keeping a boiler shut down would greatly reduce production. Thus, from a law and economics standpoint, the Company "bought" the right to pollute. It knew the cost of polluting was the stipulated penalties, and now it must pay that cost.

It may also be the case that Monitor failed to comply with the notice provisions that are required to take advantage of the force majeure clause in ¶ 27 of the Consent Judgment. The record is somewhat unclear as to the extent of notice for the emissions. If notice was insufficient, that would also constitute an additional reason not to find the force majeure clause to apply.

Therefore, Monitor must pay the $136,500 in penalties for the opacity emissions.

2. The sugar spill resulted in repeated shutdowns amounting to $50,300 in penalties sought. Stephenson Aff. at 4.

## III.  Monitoring Violations

■  The Plaintiffs seek $63,000 ($3,000/day times 21 days) for violations of the opacity monitoring requirements.  *See* ¶ 31 of Consent Judgment;  Memorandum in Support of Motion (August 27, 1990) at 11. At one time, the monitor broke down for 21 days.  The consent judgment at ¶ 16(c) mandates visible observations in the event of a mechanical breakdown at particular rates.  Visual observations must be taken "for at least 60 minutes of every three hour period" as required in ¶ 16(c).

In fact, observations were taken for, at most, fifteen minutes for every three hour period.[3]  Allan Sauer, an air quality manager for Monitor, submitted an affidavit that states that visible monitoring was conducted in accordance with standards promulgated by the E.P.A., following the breakdown of the automatic monitor after it was struck by lightning.  Monitor's brief notes that the Consent Judgment called for "readings in accordance with 40 C.F.R., Part 60, Appendix A, Method 9, for at least 60 minutes every three hour period ..." ¶ 16(c), but that Method 9 actually requires only fifteen minutes every three hours. Monitor claims an innocent mistake was made.

Paragraph 31 of the Consent Judgment reads:

> Monitor shall pay a stipulated penalty of $3,000 per day for each day it fails to conduct any monitoring or tests or submit any report required by Sections V and VI or this Consent Judgment.

¶ 31.

The meaning of the word "any" in the above paragraph is arguably ambiguous. For instance, if Monitor tested for fifty-nine minutes and thirty seconds (instead of sixty minutes) for every three hours, then *some* of the required monitoring would not have been conducted.  Nonetheless, it would appear rather draconian, in such a case, to assess Monitor $3,000 per day in penalties.  Clearly, the Court must draw a line in interpreting the word "any."

Monitor suggests that the fifteen minutes rather than sixty minutes of observations does not constitute a material breach. This argument seems plainly incorrect. Monitor only conducted one-fourth of the amount of observations required;  that is a "material" breach in the normal meaning of the word.  Moreover, Monitor's claim that it complied with the standard time requirements in Method 9 of the EPA regulations does not excuse its failure to adhere to the clearly written time requirements established in the Consent Judgment.  It appears reasonable to postulate that had the Plaintiffs thought the standard fifteen minutes of monitoring to be sufficient, they would not have specified a requirement four times as strict in ¶ 16(c).

It is therefore irrelevant that Monitor's mistake was unintended, that the Plaintiffs cannot show bad faith, or present evidence that some opacity violations likely occurred unrecorded as a result of the failure to comply with ¶ 16(c).  The purpose of the stipulated penalties is to let all parties be clear as to the cost for failure to comply. As is the case with a valid liquidated damages clause, the true "cost" to the plaintiffs, that is to society, for Defendant's failure to comply is not ascertainable. Monitor failed to comply, and therefore must pay the required fine of $63,000.

## IV.  Failure to Obtain a PSD Permit

■  The plaintiffs seek extensive penalties from Monitor for its failure to obtain a Prevention of Significant Deterioration (PSD) permit for Boiler Number 3, see 40 C.F.R. § 52.21(i), during the time that boiler was used for the 1988–89 and 1989–90 sugar campaigns.  A PSD permit may only be issued upon a showing that a stationary source is operating at a limit set according the "best available control technology" (BACT).  40 C.F.R. §§ 52.21(b)(12), (j)(2). Essentially, a permit allows the operator of a source to release a certain amount of particulate into the atmosphere, commonly referred to in pounds of particulate per 1,000 pounds of exhaust gas.

---

**3.**  Plaintiffs claims no more than 33 minutes of   readings were conducted on each of the 21 days.

The consent decree requires Monitor to conduct stack tests at pulp dryers 1, 2, 3 and to "achieve, demonstrate, and thereafter maintain compliance at pulp dryers 1, 2, and 3." ¶ 15(a). Monitor applied to receive a permit to allow particulate emissions at the .065 level (that is 0.065 lbs/1000 lbs emission gas) in January, 1988. The Michigan Department of Natural Resources (MDNR), determining that .05 was an appropriate level, declined the permit on September 21, 1988. Monitor did not appeal the denial. Monitor did submit a second application, that was ultimately approved following the 1990 campaign at the .065 level. Monitor operated pulp dryer 3 without a permit throughout the 1988–89 sugar campaign.

The plaintiffs seek $117,000 for Monitor's operation of Pulp Dryer 3 for the 117 days of the 1988–89 sugar campaign without a PSD permit.

In their supplemental complaint, Plaintiffs seek $129,000 for stipulated penalties for operation without a PSD permit during the 1989–90 campaign.

Monitor claims that the delay of the MDNR in issuing the PSD permit constituted an event beyond its control and that the force majeure clause applies. Prohibitive costs in failing to operate Boiler 3 made shutdown of that boiler an unrealistic option.

Monitor's claim here is somewhat stronger than in the case of the monitoring devices since the Company could not act by itself to obtain a permit. The MDNR delayed in issuing the permit at the .065 level, which was for the "best available control technology." Nonetheless, Monitor chose to knowingly operate Boiler 3 without a permit because the costs of not doing so appeared prohibitive. The firm's economic calculation should have included the calculation of the stipulated damages set out in the consent decree.

The damages sought here should come as no surprise to Monitor. The Company faced an unpleasant choice: shut down boiler 3 or violate the consent agreement. They chose the latter. Now they must pay the $246,000 requested by plaintiffs as a consequence. Had Monitor not signed the consent agreement establishing the stipulated penalties, and had it not agreed to subject itself to these penalties if MDNR failed to approve the permit, the Company would not have been in the situation that it finds itself.

### V. Pulp Dryer Test Violations

On October 19, 1989, Monitor tested Pulp 3 in a stack test and the result was particulate emissions at an average of 0.111. A follow-up test on November 9, 1988 yielded a test result of 0.061.

The plaintiffs seek $110,000 for the nineteen days during which pulp dryer 3 ran at a level that the company did not show to be as low as .065, the level of the non-PSD permit in operation at the time, Permit 81–85A.

In addition, the plaintiffs seek penalties of $33,000.00 ($3,000 per day) for failure to submit the stack test of October 14, 1988 until December 24, 1988, eleven days after the results were due under ¶ 15, providing for submission to EPA and MDNR within 45 days.

Defendants appear to suggest that the first test results of October 14 were not accurate. However, they have made no factual showing to that effect. I will leave this question open for an evidentiary hearing, *see infra*, to determine whether the October test was accurate. The late fee of $33,000 cannot be excused, however, regardless of the results of the hearing.

### VI. $1.88 Million Stack Test

Plaintiffs claim $1.88 million for failure to comply with the soot blowing requirements. The independent test conducted by Monitor's consultant returned with a report of .309 ($< >$ 10%), which the testing company told Monitor was a passing grade. The MDNR examined these figures several months later and recalculated the figure based upon an average soot blowing of three minutes per day. This different assumption resulted in a failing test result. In addition, Plaintiffs claim that the .309 report is a failing grade.

In connection with this issue, Monitor strenuously requested an evidentiary hearing because of factual disputes regarding the appropriateness of the assumptions and the margins of error. This request is quite reasonable, and a hearing is set for February 11, 1993 at 1:30 p.m.

## VII. Contempt Order re: Odor Issue with State of Michigan

For civil contempt sanctions for the previously found contemptuous violations of the consent decree, the State of Michigan seeks coercive civil fines and reimbursement for the State's expenses and costs associated with the enforcement.

■ The amount of the coercive civil fines should be in an amount to induce compliance. The State of Michigan notes Monitor's consultant's estimate of the cost of certain odor abatement control equipment and hardware is $2,215,200. Next, Michigan wants to determine the economic benefit to Monitor by its noncompliance since this is the method used by the EPA as the basis for the civil penalty policy. The State computes the daily savings attributable to Monitor's noncompliance (*See* Attachment A to Michigan's Statement of Civil Contempt Sanctions and Related Relief). Since this is a break-even point, to be adequately coercive, the State seeks an increase to $5,600 a day for each citizen complaint regarding malodors received by the Michigan Department of Natural Resources–Air Quality Division (MDNR–AQD) and which is verified by an MDNR–AQD inspector to emanate from Monitor's facility.

As to the contempt based upon the inadequacy in the consultant's report (degree of aeration necessary to prevent Monitor's lagoon from being anaerobic or odorous and alternatives to existing beet processing methods and materials handling methods), Michigan urges the Court to order Monitor to hire a consultant approved by MDNR–AQD to address those issues, the report to be submitted to the Court and the parties without an opportunity for editing.

As to the third contemptuous failure by Monitor—the submissions of plans and specifications along with necessary permit applications for the installation of odor abatement control equipment and hardware—the State urges that Monitor be ordered to install the equipment recommended by its consultant in its January and May 1988 reports. (An itemization is listed at page 8 of Michigan's submission taken from Exh. 2 at 6 and Exh. 8 at 6–16 of Michigan's Motion to Enforce Odor Abatement Consent Decree). For violations of this order the State seeks a coercive fine of $5,600 a day for each day after a 30–day grace period which begins at the beginning of the next sugar campaign and shall last for as long as the plans and specifications are not submitted.

As to the dredging activities which were held to be in violation of the consent judgment, Michigan seeks $4,600 for each day Monitor exceeds the 60–day dredging limitation.

And, finally, Michigan seeks an award of attorney's fees and expenses in the amount of $36,457.27 for the work of the State of Michigan in enforcing the Consent Judgment.

Monitor's response notes that the coercive fine sought based on Monitor's estimate of the $2,215,200 (the estimated costs of certain equipment) is erroneous because it did spend $2,757,000 during that period and has committed to spend $2,377,000 more in the immediate future for the installation of a clarifier. Thus, the civil fine predicated as urged by the State of Michigan is inappropriate.

In addition, Monitor claims that fines based upon frequency of citizens' complaints without regard to many other factors including a consideration as to whether the complaints resulted in an unreasonable interference with the comfortable enjoyment of life, is not appropriate. Monitor, instead, suggests an oversight fee of perhaps $100 per received complaint and specific penalties to be determined by the Court on application after evaluating the basis for the complaint.

Monitor seems agreeable to engaging an additional consultant and suggests Lloyd

Norman and Hurst and Henrich who have already done some work for Monitor and suggest that the Court approve a methodology where both Hurst, Henrich and Norman act as consultants at Monitor's expense and report their findings and recommendations for further control equipment or operational changes. Monitor is opposed to any deadline for plan submission without input from the consultants and want to avoid technical inadequacy complaints as there is no standard by which to judge adequacy.

Monitor also sets forth what it has done, is doing and potentially may do and the impact thereof on its operation.

And, finally, Monitor asserts that its studies show a real decline in odor complaints, asserts that it does not contest the time expended nor the hourly rates for the Brouillets, Reed, Bachelor or Charley, and asserts that Mr. Chester's cost to the State be similarly computed (actual cost times hours).

Michigan's response to Monitor's answer that it has spent in excess of $5 million on new equipment which will reduce noxious odors and that that fact should be weighed in determining contempt sanctions, is that such demonstrates that Michigan underestimated the savings to Monitor by not having complied and that consideration should increase the daily coercion sanction to $8,160, computed in the same way as the earlier coercive rate requested was computed.

As to the claim that not all noxious odors are banned by the decree, Michigan is agreeable to limit its claim to odors which are "distinct and definite: [where] unpleasant characteristics are revealed or foreshadowed."

As to Norman and the firm Hurst and Heinrich, Michigan wants them not to be consultants but to finalize the work left unfinished by JMS since Norman is not credentialed in odor control and abatement and Hurst and Heinrich has a vested interest in selling equipment. Michigan wants Monitor to select its own consultant or the Court to appoint its own consultant from a list.

As to the determination of technical inadequacy of the plans and specifications, Michigan asserts that if Michigan thinks the plans are inadequate, the question should be resolved not by it, but by the Court. Consistently with this view, Michigan states the coercive penalty only applies if the Court determines the plans and specifications to be technically inadequate.

As to what Monitor has done as stated in its response, Michigan needs to examine Monitor's plans and specifications required to determine what has been done, but that Michigan wants the plans and specifications for the insulation for the clarifier sludge dewatering system recommended by JMS.

And as to attorney's fees, Michigan states it is entitled to recover reasonable attorney's fees which are not measured by the cost to the state of Attorney Chester's work.

■ The Court's view of this matter proceeds from the notion that Monitor should pay an amount that will deter future violations by other potential violators as well as by Monitor in the future. Failure to abide by a consent decree is a serious matter that deserves the attention of senior management of large corporations. This is especially true when the violations occur at physical cost to human beings. Corporations should "internalize" the cost of their pollution into their economic calculations. They will not do so unless they are made to abide by their agreements not to pollute. Therefore, Monitor's efforts subsequent to the August, 1991 order to reduce its odors do not justify a reduction in the penalty sought.

Moreover, the Court, upon considerable reflection, considers the hiring of a consultant unnecessary either to adequately determine the savings Monitor achieved by failing to comply with the consent decree or by mandating the purchase of future equipment. Monitor argued in its Reply of September 30, 1991, that preventing odor emissions might be technically infeasible, and that a consultant should be hired to decide exactly what odor emissions were

reasonable. Since that time, however, Monitor has submitted to the Court its plans for the new odor control system, which according to the Company are working quite well. Monitor has not demonstrated why it could not have implemented this plan a few years earlier. Given these facts, no consultant is necessary.

The Court is content to fine Monitor for its past contempt and allow the State to bring a new court action in the future if the situation has not been adequately addressed by Monitor's new equipment.

Prior to imposing a fine, it is worth recalling exactly what Monitor has been doing to its neighbors for several years. The following is a sample (not all) of complaints received by the MDNR during the first part of 1990:

"Complainant phoned to report pungent odor coming from Monitor Sugar facility ... She said odor makes her nauseous." 1/05/90

"Complainant described odor as that of pig manure. Complainant lives 1 mile southeast of plant." 1/17/90

"She called to complain about putrid stench from Monitor today. The odor smells like sewer gas with decay." 2/20/90

"On Wednesday evening, 3/14/90, the odor from Monitor Sugar was so strong that it caused nose and eye burning. Wind direction was southwest. Complainant indicated that odor was that of outhouse."

"Health affects [sic]—nausea" 3/16/90

"Real bad outhouse odor observed by complainant and others at Zion Church in Bay City. Complainant indicated that odor was sickening." 4/27/90

"Smell really bad. Had to take clothes down from line in back yard. Odor gags you, just about. Smells about like human waste. Real bad right now." 4/30/90

"Can't open door. Can't stand to be outside. Can't open windows and its pretty hot outside." 4/30/90

MDNR records, Sent to Court by Plaintiff State of Michigan, May 31, 1991.

Other complaints from 1991 include headaches, vomiting, and nausea caused by the odor. *Id.* Essentially, Monitor has been making people ill as well as uncomfortable over a multi-year period of time. Monitor's own odor log reports several days of "intolerable" odors.

The Company has since submitted a notice that it received an award from the Michigan Chamber of Commerce for its improvements in the odor problem. While the Court is happy to learn of this recent achievement, that does nothing to restore the days of unpleasantness and illness lost by Monitor's neighbors as a result of Monitor's prior discharges. Monitor may be a good corporate citizen today, but as recently as a year ago, it caused its neighbors harm.

■ The Court finds that the State's proposed fine of $5,600.00 per independently verified complaint is not only reasonable but conservative in light of the circumstances, and hereby awards the State that amount as a penalty for civil contempt. This fine shall be assessed for all *future* violations of the consent decree as well. In addition, all fees requested by the State are reasonable, including Mr. Chester's rate of $160 per hour and are granted.

The Court therefore has signed the State's proposed Order, with some modifications.

VIII. Attorney's Fees in the MDNR, EPA Joint Action

■ This Court will award Attorney's fees to plaintiffs for this case following the conclusion of remaining issues. Monitor has dragged out a problem that originated in the early 1970's into very expensive litigation.[4] The State and federal governments are authorized to obtain fees in an action under this consent decree. Here, the plaintiffs have won much of what they have sought, and are thereby entitled to fees.

SO ORDERED.

---

4. Admittedly, this Court has been responsible      for delay in resolving this matter as well.

## ORDER IMPOSING CIVIL CONTEMPT SANCTIONS AND RELATED RELIEF

This matter came before the Court on plaintiff's Motion To Enforce Odor Abatement Consent Decree And For An Order To Show Cause Why Defendant Should Not Be Held In Civil Contempt. A hearing on the Motion was held on August 2, 1989. Upon review of the pleadings and supporting documents, and after hearing oral argument and testimony from plaintiffs and defendant, this Court issued a Memorandum Opinion And Order dated August 16, 1991 granting plaintiffs' Motion.

NOW, THEREFORE, for the reasons set forth by the Court in its Memorandum Opinion And Order, and for such other reasons as set forth in the record, and the Court being fully advised in the premises;

IT IS ORDERED:

1. Defendant Monitor Sugar Company ("Monitor") shall not emit malodors from its sugar beet processing facility (the "Facility") located at 2600 South Euclid, Bay City, Michigan, in violation of the Odor Abatement Consent Decree entered by this Court on September 28, 1987. After the effective date of this Order, Monitor shall pay a coercive civil contempt sanction of $5,600 per day for each citizen odor complaint received by the Michigan Department of Natural Resources, Air Quality Division (MDNR–AQD) that is independently verified by an MDNR–AQD inspector to be a valid complaint of malodors emanating from the Facility. This contempt sanction shall apply to each odor complaint so verified by MDNR–AQD, regardless if more than one complaint is received at the same time or on the same day. Additionally, this coercive civil fine shall apply for each day that such malodors continue to be emitted from the Facility, as verified by the MDNR–AQD.

2. Consistent with the terms of the Odor Abatement Consent Decree, Monitor shall complete all dredging activities each campaign year as expeditiously as practicable, with all dredging activities being completed within 60 calendar days of commencement of any dredging activities at the Facility. Monitor shall notify MDNR–AQD at least 24 hours in advance of the date that it is to begin dredging activities. After the effective date of this Order, Monitor shall pay a daily coercive civil contempt fine of $5,600 for each day dredging activities are conducted at the Facility beyond the 60–day limitation specified above.

3. Within 30 days of the effective date of this Order, Monitor shall pay to plaintiffs, by check made payable to the "State of Michigan" and delivered to the Assistant Attorney General In Charge, Michigan Department of Attorney General, Environmental Protection Division, Post Office Box 30212, Lansing, Michigan 48909, the sum of $36,457.27 to cover the expenses, costs, and fees incurred by the plaintiffs through enforcement of the Odor Abatement Consent Decree.

4. Monitor shall pay all daily coercive civil fines that accrue pursuant to operation of this Order to the Assistant Attorney General In Charge, Michigan Department of Attorney General, Environmental Protection Division, Post Office Box 30212, Lansing, Michigan 48909.