**UNITED STATES of America, Plaintiff,**

v.

**KEY WEST TOWERS, INC., et al., Defendants.**

No. 87–10034–Civ.

United States District Court, S.D. Florida.

Aug. 10, 1989.

See also 696 F.Supp. 1467.

Leon B. Kellner, U.S. Atty., Miami, Fla., by Suzan Hill Ponzoli, for plaintiff.

Shutts & Bowen, Miami, Fla. by Kimarie Stratos, and Robert G. Dreher, Sierra Club & Florida Audubon Soc., Sierra Club Legal Defense Fund, Inc., Washington, D.C., for plaintiff-intervenors.

Mattson & Tobin, Key Largo, Fla., Kay G. Finley, Summerland Key, Fla., Thomson, Zeder, Bohrer, Werth & Razook, Halsey &

Smith, Miami, Fla., and William N. Hedeman, Jr., Beveridge & Diamond P.C., Washington, D.C., for defendants.

David P. Kirwan, Marathon, Fla., for Richard and Steve Eid.

## ORDER REQUIRING RESTORATION; ORDER IMPOSING PENALTY

JAMES LAWRENCE KING, Chief Judge.

The defendants own property in Key West, Florida, that contains wetlands, including a pond, mangroves, and transitional wetlands. A 1.9–acre pond makes up part of the 4.42 acres of total wetlands. Key West Towers partially filled the wetlands in 1984, before it received a cease and desist order from the Army Corps of Engineers ("Corps"). Despite the subsequent order and repeated requests from the Corps, Key West Towers continued filling the wetlands in 1985, 1986, and 1987. On August 7, 1985, Key West Towers submitted an Army Corps of Engineers permit application requesting after-the-fact authorization for 2.1 acres of wetlands already filled and 2.4 acres of proposed wetlands filling. The application, however, was inaccurate and overestimated the amount of wetlands that had been previously filled, and the permit application was ultimately deactivated in 1987.

The United States, in an effort to maintain and save these beautiful wetlands in Key West, filed a civil enforcement action pursuant to the Clean Water Act, 33 U.S.C. §§ 1311 and 1319. On July 20, 1988, the lawsuit culminated in a jury verdict that found the pond and wetlands at Key West Towers were adjacent to waters of the United States, the specific area in dispute was wetlands as defined in the regulations of the Army Corps of Engineers, and that fill had been placed in those wetlands in 1984, 1985, 1986, and 1987.

After the jury verdict, the defendants moved for a hearing on penalty and restoration. On May 22, 1989, in open court, the parties agreed to a restoration plan, which is memorialized in this order. The court then held a hearing on the remaining issue, the civil penalty, on May 24, 1989. Although the Clean Water Act provides for a penalty of up to $10,000 per day for each violation of 33 U.S.C. § 1311 prior to February 4, 1987, and up to $25,000 per day for each violation subsequent to that date,[1] the plaintiff only seeks a penalty of $250,000[2]. After careful consideration, the court agrees that this penalty is appropriate, but will provide the defendant with an option to satisfy this penalty. Specifically, the defendants can either pay the penalty in full or deed the two-acre pond to a charitable organization in fee simple absolute.

## RESTORATION

On May 22, 1989, the parties agreed upon a restoration plan to return the Key West Towers site to its natural state prior to the defendants' activities in 1984. The defendants agree to scrape fill to natural historic elevations within the 1984 jurisdictional line as determined by the jury.[3] The parties agree that if the defendants need to leave the paved road and a minimally necessary shoulder in place in the wetlands, they may scrape down equal square footage on the southeast side of the wetlands contiguous with the jurisdictional line.

The defendants, in terms of actual restoration, agree to replant 24 mangroves or buttonwood trees, 18 inches to 24 inches in height, around the end of the restored pond. In lieu of replanting grasses in the transitional wetlands, the defendants will remove and replace all exotic species from the restored area for three years.[4] The parties also agree that the fill in the southeast corner will be accessed for removal directly from the south. Finally, the defen-

---

[1] A daily fine can be imposed for each day that the defendant allows illegal fill material to remain on the wetlands. *United States v. Ciampitti,* 669 F.Supp. 684, 700 (D.N.J.1987).

[2] The maximum penalty would total approximately $25,000,000.

[3] This line is reflected on the survey of September 28, 1987.

[4] The defendants will provide photographs each year as part of the progress report. Moreover, all fill must be removed to upland areas for proper disposal.

dants agree to deepen a portion of the preexisting pond in the northwest corner to minus four feet below the natural grade in an area of approximately 100 square feet, to be established by the government's expert. The completion of this project will be reflected in the time zero report.

To adequately monitor the defendants' activities,[5] the defendants will provide a time zero report at the completion of the fill removal that will include color photographs of the fill removal site taken before and after fill removal. Moreover, the defendants will provide a signed and sealed survey confirming the removal of at least .76 acres of fill in the wetlands. Similarly, the defendants will provide progress reports at time zero plus twelve months, time zero plus twenty-four months, and time zero plus thirty-six months.[6] These reports will include color photographs and a narrative description of the natural recovery of plants and the hand removal of invasive exotics observed in the fill removal areas. Upon completion of the time zero report, the government agrees to perform an inspection. After inspection and upon the government's satisfaction of compliance of the provisions of the consent decree and compliance of all other remedies ordered by the court, including penalty, the government will provide a satisfaction of judgment. The foregoing provisions, agreed to by all parties, are approved by the court and the court retains jurisdiction to enforce the terms of the agreement.

## PENALTY

While the parties were able to resolve the issues surrounding the restoration plan, they were not able to agree upon an appropriate civil penalty. The government seeks $250,000. Conversely, the defendants state that they have already been sufficiently penalized, so a further penalty is unwarranted. After considering the six factors enumerated in 33 U.S.C. § 1319(d) [7], the court agrees with the plaintiff that $250,000 is appropriate. However, because of the parties' concern with protecting the wildlife in the area, the court will allow the penalty to be lifted if the defendants deed the pond to a charitable organization.

The first consideration under 33 U.S.C. § 1319(d), the seriousness of the violation, strongly favors imposing a substantial penalty. The fresh water ponds in the lower Keys are a rare and necessary habitat for certain migratory bird species. Moreover, the transitional wetlands are a critical habitat for various wading birds. Any destruction to these rare and fragile natural resources requires a substantial penalty.

The economic benefit (if any) resulting from the violation does not necessarily justify imposing a harsh penalty. Arguably, deep fill in the corner of the pond allowed easier access to the defendants' development, and perhaps this enhanced accessibility financially benefitted the defendants. This argument, however, is speculative and is not supported by the evidence in the record. Likewise, the third factor, the history of violations, does not strongly favor a severe penalty. The evidence indicates that the defendants may have filled 2.7 acres of wetlands prior to 1984. This previous violation again allows the court to increase the civil penalty, but does not significantly aid the court in determining the appropriate amount.

Unlike the previous two considerations, the fourth factor, any good-faith efforts to comply with the applicable requirements,

---

5. With regard to all these activities on the property, the parties agree to give mutual notice. Specifically, the defendants will give one week's notice that they intend to perform work on the site. The Army Corps of Engineers will give twenty-four hours' notice that it intends to come on the property to inspect.

6. After submission of the time zero plus thirty-six months report, the government agrees to perform a final inspection.

7. The pertinent text of 33 U.S.C. § 1319(d) reads as follows:

In determining the amount of a civil penalty the court shall consider the seriousness of the violation or violations, the economic benefit (if any) resulting from the violation, any history of such violations, any good-faith efforts to comply with the applicable requirements, the economic impact of the penalty on the violator, and such other matters as justice may require.

strongly compels the court to impose a substantial civil penalty. First, the jury specifically found that the defendants filled wetlands on the Key West Towers site from 1984 through 1987. Second, the defendants' filling activities after June 1984 are especially bothersome because the filling directly violated the Corps' cease and desist order. The defendants repeatedly filled the wetlands despite being fully informed of the law.[8] Third, the defendants had their after-the-fact permit application deactivated because of the inaccuracies contained within the application. These three factors strongly indicate the defendants did not make good-faith efforts to comply with the applicable requirements, and thus the court should impose a substantial penalty.

The fifth factor, the economic impact of the penalty on the violator, also does not provide strong guidance concerning the amount of the penalty. Specifically, the government only produced the defendants' tax returns at trial, and the production of the returns is certainly not the best method to decide whether the defendants' income justifies a $250,000 fine. On the other hand, the defendants did not present evidence that a $250,000 fine would devastate them or the corporation.

On balance, these five factors indicate that a $250,000 fine would promote the specific and general deterrence theories behind a civil penalty. *See Tull v. United States*, 481 U.S. 412, 107 S.Ct. 1831, 1838, 95 L.Ed.2d 365 (1987). However, the final consideration in determining the amount of the penalty, "such other matters as justice may require," leads the court to provide the defendants with an option. Specifically, because of the parties and the court's primary concern of protecting the pond and providing a pollution-free habitat for the migratory birds and wildlife, the court will allow the defendants the option of paying the $250,000 fine or deeding to a charitable group, such as the Florida Land Trust, the

1.9–acre pond and a 50–foot buffer zone around that pond. *See United States v. Larkins*, 657 F.Supp. 76, 87 (W.D.Ky.1987) (penalty of $40,000 lifted if the defendants complete the ordered restoration plan). Based on the foregoing, the court

ORDERS and ADJUDGES that the parties abide by the restoration plan announced in court on May 22, 1989. The court further

ORDERS and ADJUDGES that the defendants are fined the sum of $250,000 payable on or before November 20, 1989. If the defendants deed the 1.9–acre pond and the 50–foot buffer zone to a charitable organization that will appropriately maintain these valued wetlands in perpetuity, the fine imposed herein will be set aside and cancelled.

DONE AND ORDERED.

---

8. Defense counsel stated at the penalty hearing that he advised his clients that their activities did not violate the Clean Water Act. As defense counsel noted, however, the jury disagreed with his opinion and, consequently, his client's filling after the Corps' order improperly aggravated the situation. A declaratory judgment action would have resolved the issue and would have prevented unnecessary harm to these wetlands.