Axel N. ELIASEN, Robert V. Rollheiser, and Allan L. Apter, on behalf of themselves and all others similarly situated, Plaintiffs–Appellants,

v.

ITEL CORPORATION, et al., Defendants–Appellees.

No. 95–3458.

United States Court of Appeals, Seventh Circuit.

Argued April 4, 1996.

Decided April 29, 1996.

Rehearing and Suggestion for Rehearing En Banc Denied May 30, 1996.

Stuart Smith (argued), Christopher L. Gallinari, Gordon & Glickson, Chicago, IL, for Plaintiffs–Appellants.

Howard J. Roin (argued), Peter John Donoghue, Jonathan L. Marks, Erik J. Lillya, Julie L. Meyers, Mayer, Brown & Platt, Chicago, IL, Lynn D. Thesing, Alpharetta, GA, for Itel Corp., Itel Rail Corp., Howard L. Chabner, James Chandler, Rod F. Dammeyer, Jack P. Edwards, Desmond Hayes, William J. Herndon, Gary M. Hill, Curtis J. Hockaday, Robert C. Kiehnle, James E. Knox, Paul L. Loveday, Carl V. Lyon, Charles D. Martin, Samuel Zell, Thomas O. Kloehn and Quarles & Brady.

Before POSNER, Chief Judge, and KANNE and EVANS, Circuit Judges.

POSNER, Chief Judge.

Three years ago Itel Corporation, which owned all the common stock plus 78 percent of the Class B debentures of the Green Bay & Western Railroad Company, sold the railroad. The owners of the remaining Class B debentures, who are the plaintiffs in this class action against Itel, claim to be entitled to share in the proceeds of the sale over and above the $1,000 face value of each debenture that they received when, in accordance with the terms of their debenture certificates, the debentures were repaid out of the proceeds of the sale. They argue that in refusing to honor their claim Itel has converted property that is rightfully theirs, in violation of both federal and state law under a variety of legal theories unnecessary to discuss. The district judge granted Itel's motion to dismiss, ruling

that the debentures did not entitle the holders to more than $1,000 per debenture. If the ruling is correct, the suit has no merit and was properly dismissed without regard to the defendant's numerous other defenses. This is so even though the plaintiffs also complain about Itel's refusal, before it sold the railroad, to credit (more precisely, to cause the railroad, which it controlled, to credit) any of the railroad's income to the Class B debentures. This complaint, at least as the plaintiffs formulated it in the district court—and it is too late for them to recast the theory of their case on appeal—hinges on their contention that they are the residual claimants to the proceeds of the sale. They say the residuum would have been greater had Itel properly applied the income to the improvement of the railroad rather than (as the plaintiffs allege it did) siphoning that income into the pockets of Itel's shareholders. If the debenture holders had no rights in the residuum, they were not harmed by the siphoning.

A debenture, as the word is normally used in the legal and financial communities of the United States, and as it was normally used a century ago as well, when the debentures involved in this suit were first issued, is a type of bond, specifically a bond unsecured by a lien. Richard A. Brealey & Stewart C. Myers, *Principles of Corporate Finance* 597 (4th ed. 1991); William Z. Ripley, *Railroads: Finance & Organization* 142 (1915). Ordinarily, when a corporation is sold, the proceeds above what is needed to pay off creditors, including bondholders—including therefore debenture holders—go to the shareholders, as the residual claimants to the corporation's assets. The plaintiffs argue that, contrary to the norm, the Class B debentures in the Green Bay & Western Railroad Company were intended to be the equivalent of shares of stock, while the shares of stock were intended to be the equivalent of debentures. They ask us to look behind the labels of these instruments to the economic reality.

Each debenture certificate is a contract between the railroad and the debenture holder, and parties to a contract can agree to use words in a nonstandard sense. But it does not help the plaintiffs' case that they are unable to direct us to any other instance in U.S. corporate history in which the word "debenture" has been used to denote an equity interest. Convertible debentures, that is, debentures convertible into stock upon the coming to pass of stated conditions, have by virtue of their conversion feature an equity hue; but the debentures issued by the Green Bay & Western Railroad are not convertible. A treatise gives an example of where the term "debenture" has been interpreted to mean preferred stock. 6 *Fletcher Cyclopedia of the Law of Private Corporations* § 2649.1, p. 27 (1989 rev. ed.). But there is much less space between a conventional debenture and preferred stock than between a conventional debenture and common stock, since preferred stock normally is "maxed out" at its stated par value, 11 *id.* at § 5303, p. 592, just like the Class B debentures if Itel's interpretation is accepted.

To determine whether the interpretation is correct requires an examination of the history and terms of the securities. The Green Bay & Western Railroad was created, under a different name, in 1866. It went broke ten years later and again in 1888, emerging from the second bankruptcy exactly one century ago, in 1896, with a radically new capital structure. The first mortgagees, who had foreclosed on the railroad's property, received all the capital stock of the new company—25,000 shares with a par value of $100 each. The second mortgagees and old shareholders received the Class B debentures— 7,000 debentures each with a face value, as we have said, of $1,000. They also received, in exchange for investing $600,000 of new money, 600 Class A debentures with a face value of $1,000 each. None of the three classes of securities specified either maturity dates or a fixed entitlement to income, and only the capital stock had voting rights.

Although the debentures do not create a fixed entitlement to interest or dividends, they do provide for the allocation of any annual dividends that the board of directors decides to declare. The dividends are to go to the holders of the Class A debentures until those investors have received 2.5 percent of the face value of the debenture, then

to the shareholders until they have received 2.5 percent of the par value of their stock, and then to the holders of the Class A debentures and the shareholders, pro rata, until the two groups have received a total of 5 percent of the face value of the Class A debentures and of the par value of the stock. Any money left after these distributions is to go to the holders of the Class B debentures. In simplest terms, then, the Class B debenture holders are entitled to any dividends that exceed what is necessary to give the shareholders and the Class A debenture holders 5 percent of the face amount of their securities.

In the event of a sale or reorganization of the company, the Class B debenture certificate specifies the following distribution of the proceeds after payment of all liens and charges: the first $600,000 to the holders of the Class A debentures, the next $2.5 million to the shareholders, and either the rest—or the first $7 million of the rest—to the holders of the Class B debentures. Which it is the issue in this case.

Each Class B debenture certificate states that the Green Bay & Western Railroad Company

> certifies that this is one of a series of seven thousand of its Class B Debentures, in the sum of ONE THOUSAND DOLLARS each, aggregating in all the sum of Seven Million Dollars, *which sum of One Thousand Dollars will be payable to the bearer hereof* as follows: viz., only in the event of a sale or reorganization of the Railroad and property of said Company, and then only out of any net proceeds of such sale or reorganization which may remain after payment of any liens and charges upon such railroad or property, and after payment of Six Hundred Thousand Dollars to the holders of a series of Debentures known as Class A, issued or to be issued, by said Company, and the sum of Two Million Five Hundred Thousand Dollars to and among the stockholders of said Company. *Any such net proceeds remaining after such payments shall be distributed pro rata to and among the holders of this series of Class B Debentures.* [Emphasis added].

Itel argues that the first clause that we have italicized makes clear that the only entitlement of the holders of Class B debentures is to $1,000 per debenture. The plaintiffs argue that the last sentence in the quoted passage, which we have also italicized, makes clear that any proceeds from a sale over and above all liens and charges, $600,000 to the holders of the Class A debentures, and $2.5 million to the shareholders, go to the holders of the Class B debentures, making them in effect the equity owners of the railroad. On Itel's reading the shareholders have a debt-like claim to the par value of their stock (the $2.5 million) that is subordinate only to the other creditor interests, including the Class A debentures but excluding the Class B debentures, but they also have the normal equity interest, which comes into play after the Class B debenture holders are paid their $7 million.

The question of what happens after the Class B debenture holders receive the full face value of their debentures cannot arise unless at the time of sale or reorganization the net value of the company exceeds $10.1 million, the sum of the face or par values of the three classes of security. That happy eventuality must have seemed remote in 1896, for the debentures and other documents of the 1896 reorganization do not make clear provision for it. Nevertheless the presumption in 1896 as now was (is) that the residual, unprovided-for value of a corporation belongs to the shareholders rather than to the holders of debentures or other bonds. The first clause that we italicized in the Class B debenture reinforces the presumption, for it states flatly that the holder's right in the event of a sale or reorganization of the railroad is to receive the face amount of the debenture, $1,000. The sentence on which the plaintiffs rely can easily be read as merely specifying the mode of distribution among the Class B debenture holders in what must have seemed the likely event that the proceeds of the sale were insufficient to give them the full $7 million.

It is true that on Itel's interpretation the Class B debenture holders got very little in the reorganization. They got no right to any income unless the board of directors decided

to declare a dividend larger than 5 percent of the combined face value of the Class A debentures and par value of the common stock, that is, more than 5 percent of $3.1 million ($155,000). And if the railroad was never sold or reorganized, the debenture holders would never get their principal back. But remember that the recipients of the Class B debentures were the junior mortgagees, and the shareholders, of a bankrupt railroad. They may have gotten little in exchange for the surrender of their interests in the railroad because those interests were worth little. *Eliasen v. Green Bay & Western R.R.,* 569 F.Supp. 84, 90 (E.D.Wis.1982), aff'd. without opinion, 705 F.2d 461 (7th Cir.1983). The junior mortgagees had not been paid anything on their mortgages for the fourteen years preceding the reorganization. *Leuw v. Green Bay & Western R.R.,* No. 89–CV–53, slip op. at 6 (Wis.Cir.Ct. Feb. 1, 1993). To the extent that these investors did not merely exchange their old interests for new ones but also contributed new value to the railroad, as they did, they were compensated by receiving Class A debentures. Those debentures were entitled to priority both in the distribution of the railroad's income and in the eventuality of a sale or reorganization. The new shareholders, having in their previous capacity as first mortgagees already foreclosed on the railroad, received both voting control and a bond-like entitlement to $2.5 million in the event that a sale or reorganization yielded net proceeds after all liens and charges of at least $3.1 million, plus (on Itel's interpretation) what must have seemed the remote possibility of an additional return should the railroad be sold and reorganized at a time when it had attained a net worth in excess of $10.1 million.

Itel's interpretation makes better economic sense than the plaintiffs' because it is more consistent with the creation and maintenance of proper incentives for operating the railroad in such a way as to maximize its value. (This is relevant because most commercial transactions are designed to be value-maximizing.) Only the shareholders had been given voting rights. Only the shareholders, therefore, could control the management of the corporation. If they had no right to any part of the gain from increasing the value of the corporation above $3.1 million, the level that would just cover their fixed entitlement to $2.5 million, they would have had little zeal for developing the railroad to the level it reached when it was sold in 1993. We do not know the sale price, because Itel sold the Green Bay & Western Railroad together with another railroad for a combined price of $64 million. The plaintiffs claim that $43 million is the *minimum* amount of the sale price fairly allocable to the Green Bay, which if so would entitle the Class B debenture holders, under the plaintiffs' theory of the case, to roughly $40 million. The plaintiffs, recall, own 22 percent of those debentures.

A corporate structure in which the bondholders, for that is what the plaintiffs think the shareholders are—holders of 25,000 bonds worth $100 apiece—have all the voting rights, and the shareholders, who are what the plaintiffs consider the Class B debenture holders to be, have no voting rights, is anomalous. See Frank H. Easterbrook and Daniel R. Fischel, "Voting in Corporate Law," 26 *J.Law & Econ.* 395, 403–05 (1983). And yet this inverted corporate structure would not be crazy if at the time it was created the possibility that the railroad would ever be worth at least $10.1 million was so remote that the shareholders, even if they were the residual claimants, would have no incentive to maximize the value of the railroad, beyond trying to create a cushion to protect their $2.5 million bond-like entitlement. As Easterbrook and Fischel point out, corporate indentures frequently shift voting rights to creditor groups when financial distress attenuates the shareholders' interests and makes the creditors the de facto residual claimants to the value of the corporation's assets. *Id.* at 404–05. Throughout most of the history of the railroad it has been the Class B debenture holders who have been the real equity owners, because until the railroad attained a net value of $10.1 million (which for all we know has not yet occurred) any increase in value would enure to the benefit of those investors. But this is an argument for having given the Class B debenture holders the voting rights and hence control of the corporation, which the reorganization plan and the debenture certif-

icates did not do. The only way to give the shareholders, who do control the corporation, a robust incentive to maximize the railroad's value is to give them an equity kicker above the Class B debenture holders' entitlement, and so the debenture contract can be presumed to have done this.

Another reason to doubt that the debenture holders received an equity interest is that the shareholders, being in control of the corporation as a consequence of their voting rights, could so easily circumvent that interest. Before a sale or reorganization of the railroad the value of the debentures would be depressed because the holders would have no right to force either a sale of the railroad or a declaration of dividends in an amount that would give any part of the railroad's income to the debenture holders. The owners of the stock could therefore buy up the debentures cheap, so that, when the railroad was sold, the stockholders (now also the debenture holders) would obtain the benefits of the equity interest nominally held, under the plaintiffs' interpretation, by the debenture holders. And indeed when Itel bought the railroad's common stock it also bought 78 percent of the Class B debentures.

So uncertain was the right of the debenture holders to income from the corporation that the Tax Court ruled, in a decision upheld by this court in *Green Bay & W.R. Co. v. Commissioner,* 147 F.2d 585 (7th Cir. 1945), that the railroad could not deduct payments to either class of debenture holders as interest. Instead it had to treat these payments for tax purposes as dividends (the term, as it happens, used in the debentures themselves). But this is just to say that the debenture holders have no interest entitlement. It does not address the question of their entitlement in the event of a sale. This is obvious from the fact that the court treated the Class A debenture holders the same as the Class B holders, even though it is indisputable that the former are entitled only to the face value of their debentures in the event of a sale.

So the tax case cannot do much for the plaintiffs and neither can *Biltchik v. Green Bay & W.R. Co.,* 250 Wis. 177, 26 N.W.2d 633 (1947), despite its tantalizing dictum that the provision "as to distribution on liquidation puts the holders of the Class B Debentures on the footing of stockholders of an ordinary corporation. It makes them, instead of the stockholders, the owners of the equity of the corporation." *Id.* 26 N.W.2d at 635. The issue in *Biltchik* was whether the railroad's board of directors had any duty to declare a dividend large enough to give the Class B debenture holders some income. The court held that the board had no such duty as long as it used the railroad's income for proper purposes. The court pointed out that the Class B debenture holders might benefit indirectly if the railroad rather than paying generous dividends plowed back its earnings into improvements, since that would make the railroad worth more in the event it was sold. If the railroad was already worth $10.1 million, such improvements would not benefit the Class B debenture holders directly if their entitlement in the event of a sale or reorganization is capped at $7 million, although it would do so indirectly, by increasing the probability that they would be paid in full should the railroad ever be sold. But it is fairly plain that the railroad was worth much less than $10.1 million at the time of *Biltchik.* See *id.* 26 N.W.2d at 635. So the cap was not material and the court's passing remark about the status of the Class B debenture holders cannot be considered authoritative.

■ Even if as we believe Itel has the better of the argument when consideration is limited to the text of the Class B debenture, should consideration be so limited? Since the debenture makes no explicit provision for the allocation of the net proceeds of sale above $10.1 million, and since the last sentence that we quoted from the debenture certificate, the sentence on which the plaintiffs pitch their case, provides at least some support for it, there is enough ambiguity to permit the consideration of extrinsic evidence, that is, evidence outside the text of the Class B debenture itself. Itel implicitly acknowledges this by pointing out that these debentures were issued in exchange for interests that probably had little value.

■ The first item of extrinsic evidence that the plaintiffs want us to consider is the

text of the Class A debenture. It is almost identical to that of the Class B debenture, except that the first sentence of the Class A debenture, of course, states the entitlement of the holders of that debenture to *their* $1,000 rather than the entitlement of the Class B debenture holders to their $1,000. Like the Class B debenture, the Class A debenture goes on to specify the order of distribution, including the payment to the holders of the Class B debentures of the surplus after satisfaction of the entitlements of the Class A debenture holders and the shareholders. Since the first sentence of the Class A debenture does not mention the Class B debenture holders, there is nothing to qualify the last sentence—the sentence that taken by itself appears to give the entire surplus, with no $7 million cap, to those debenture holders. That sentence is not found, however, in the description of the Class A debentures that appears in the articles of incorporation of the reorganized firm. And to the holder of a Class A debenture the only important thing is his entitlement, and not, after his entitlement has been satisfied, how any surplus above the amount necessary to satisfy it is to be divided between other classes of investor. It would be odd for the owner of a Class B debenture to look to the text of *another* debenture for the statement of his rights (though, granted, initially the holders of the two classes of debentures were the same people—the railroad's second mortgagees and former shareholders). No one reading the Class B debenture, with its flat statement that it entitles the holder to $1,000 if the railroad is ever sold or reorganized, would suppose that it entitled the holder to more—to almost six times as much, in fact, if the plaintiffs' estimate of the sale price of the railroad is correct.

█ The plaintiffs point to a series of statements that the railroad made, some in the two cases that we discussed, some in other cases, others in submissions to the SEC and the ICC, which the plaintiffs construe as admissions that the Class B debenture holders are the residual owners of the railroad. So far as appears, however, these statements (contradicted, incidentally, by others, which do refer to the $7 million cap) were made at a time when the railroad was worth less than $10.1 million, so that the question of the entitlement to any surplus value above that was academic. In the 1940s, when *Biltchik* and the tax case were decided, the market value of the Class B debentures was only $120, implying that the net worth of the railroad may have been as little as $3,940,000 ($.6 million plus $2.5 million plus 7,000 × $120). If so, the Class B debenture holders were the real equity owners, because, had the railroad been sold then at that price, they would have received the entire net proceeds minus the $3.1 million reserved for the Class A debenture holders and the shareholders.

Despite what we have just said, the value of the railroad cannot be inferred directly from the market value of the Class B debentures. That market value would have been depressed by the inability of the debenture holders to force a sale or a distribution of income to them. The court in *Biltchik* thought the railroad worth more, about $5 million—or so we infer from 26 N.W.2d at 635. This estimate may well have been more realistic. But it is still far below the point at which the Class B debenture holders would be paid in full in the event the railroad was sold.

The plaintiffs presented no evidence of the value of the railroad at any of the times when the statements on which they rely were made, although it appears that as late as 1986 the railroad was worth no more than $8.4 million. *Leuw v. Green Bay & Western R.R., supra,* slip op. at 21, 48. Itel had acquired its interest in the railroad—100 percent of the common stock and 78 percent of the Class B debentures—in 1978 for a total of $8 million. (Because it had bought securities of the railroad rather than the railroad itself, its purchase did not trigger the entitlement of the debenture holders to be paid out.) The plaintiffs' claim that the railroad was sold for at least $43 million in 1993 appears to be grossly exaggerated. Itel had paid $61 million for the Fox River Valley Railroad, the railroad it sold together with the Green Bay & Western Railroad for $64 million in 1993.

Remarks, even considered statements, that the Class B debenture holders were the real equity owners of the Green Bay, made at the time when they *were* the real though not formal equity owners, are not highly probative of what their status would be if the residual value of the railroad rose above the face amount of those debentures. The plaintiffs want a trial but have cited no evidence that would rebut the presumption from the text and history and economic logic of the Class B debenture that it caps the holders' entitlement at $7 million. No jury would be permitted to speculate that this debenture was really a share of stock.

■■■ Yet the thrust of our analysis has been that Itel was entitled to summary judgment, not that the complaint should have been dismissed for failure to state a claim. While a court, either the district court or the court of appeals, can grant summary judgment even though neither party has moved for it, it must not do so without giving the party against whom the court proposes to enter summary judgment notice of what is in store for that party. *Resolution Trust Corp. v. Ruggiero,* 994 F.2d 1221, 1226 (7th Cir. 1993). But this is not a problem here. The plaintiffs have laid out their extrinsic evidence—the evidence they think creates a triable issue—in full in their briefs in this court and Itel has explained why it thinks that the plaintiffs' evidence does not create a triable issue. This is equivalent to Itel's arguing that if it was not entitled to dismissal under Rule 12(b)(6) it was entitled to summary judgment. The plaintiffs had, and have availed themselves, of the opportunity to reply to the argument. In effect the parties have recast the issue on appeal as whether we should grant summary judgment for the defendant. We should and do. The judgment is therefore

AFFIRMED.