**UNITED STATES of America, Plaintiff,**

v.

**Robert R. KRILICH, Krilich Companies, Inc., Riverwoods Development Corp., Lakemoor Club, Inc., Austin State Bank Trust, etc., and Manufacturers Affiliated Trust Co., etc., Defendants.**

No. 92 C 5354.

United States District Court,
N.D. Illinois,
Eastern Division.

May 31, 1996.

Opinion Denying Reconsideration
Aug. 27, 1996.

---

James J. Kubik, Assistant United States Attorney, Chicago, IL, for Plaintiff.

Raymond T. Reott, Cynthia A. Drew, Jenner & Block, Chicago, IL, for Defendants.

## MEMORANDUM OPINION AND ORDER

HART, District Judge.

Defendants in this case are Robert Krilich and various corporations that he controls. Plaintiff United States alleged that defendants, in violation of the Clean Water Act, filled wetlands at two sites they owned in the Chicago area. Prior to the filing of this case in August 1992, the parties had agreed to a proposed consent decree. Following a comment period and the filing of motions with the court, the proposed consent decree, as modified, (the "Decree") was entered on October 29, 1992. Now pending is the government's motion to enforce the Decree. The government seeks to impose monetary penalties under the Decree for (a) defendants' alleged failure to comply with Decree deadlines for creating a 3.10 acre wetland on the Royce Renaissance Property and (b) defendants' post-Decree conduct of discharging fill in an area known as W9, which the government contends is defined as a water of the United States under the Decree.

Following initial examination of the parties' briefs on the enforcement issue, it appeared that a hearing on possible contested facts was required prior to ruling on the

government's motion. However, to refine the issues and clarify any factual disputes, the parties were ordered to file a stipulation of uncontested facts, a statement of contested facts, and proposed findings of fact and conclusions of law. The parties filed their joint stipulation of facts and each side filed its proposed findings and conclusions. Contending there were no material facts in dispute, the government did not file any statement of contested facts. It did, however, respond to defendants' statement of contested facts, primarily contending the disputed facts were not material to the issues before the court. Having examined the stipulated facts and allegedly disputed facts, and having more closely examined the applicable law, it is now determined that a hearing is unnecessary and the motion can be resolved on the stipulated facts. The two grounds for imposing penalties will be considered separately.

## I. W9 WETLAND

The Decree provides in part:

The Defendants shall continue to treat wetland and open water areas depicted on Exhibit 1 as waters of the United States until the mandate issues in *Hoffman Homes, Inc. v. EPA,* [961 F.2d 1310] (7th Cir. April 20, 1992) [*"Hoffman I"*] and until proceedings related to any appeal, petition for certiorari, or remand are completed. Following completion of these proceedings, unless pertinent portions of the Seventh Circuit's April 20, 1992 decision are reversed, Exhibit 1 areas W2A, W2B, W3, W5B, and W9 shall be excluded from the obligations imposed in Paragraph 17.

Decree ¶ 20A.

The EPA petitioned for rehearing following *Hoffman I* and the Seventh Circuit

granted that motion, vacating *Hoffman I. See Hoffman Homes, Inc. v. Administrator, United States EPA,* 975 F.2d 1554 (7th Cir. Sept.4, 1992). Following unsuccessful attempts at mediation, the Seventh Circuit issued a new opinion reaching the same result as *Hoffman I,* but on different grounds. See *Hoffman Homes, Inc. v. Administrator, United States EPA,* 999 F.2d 256 (7th Cir. July 19, 1993) (*"Hoffman II"*). No petition for certiorari was filed and there was no remand, nor further request for rehearing. Although ¶ 20A of the Decree refers to issuance of a mandate, mandates do not issue in cases involving direct administrative review, judgments are entered.[1] *See* Fed. R.App. P. 19, 36. The Seventh Circuit does send "closing orders" to the agency that are similar to mandates. The closing order in *Hoffman* was issued on August 10, 1993, a few weeks after the *Hoffman II* opinion. In light of ¶ 20A's reference to a mandate for *Hoffman I* marking the completion of that proceeding, the issuance of the closing order following *Hoffman II* apparently would mark the completion of "these proceedings."[2] It is undisputed that W9 was filled from July 18, 1994 until removal of the fill was completed as of December 28, 1994. Joint Stipulation of Uncontested Facts ("Stip.Facts") ¶ 31. Under any construction of ¶ 20A of the Decree, the filling occurred after the completion of proceedings in the *Hoffman* case. Therefore, filling W9 can only be a violation of the Decree if "pertinent portions" of *Hoffman I* were "reversed."

As stated in *Hoffman I,* the relevant facts in that case were as follows:

Hoffman owns a 43–acre parcel of land in Hoffman Estates, Illinois, which is devel-

---

1. In cases involving partial enforcement of an administrative order, which *Hoffman* was because there were other penalties imposed in the administrative proceeding that were not appealed (*see Hoffman II,* 999 F.2d at 259), generally the agency is to submit a proposed judgment with the other party having the opportunity to object and the judgment is entered on a date subsequent to the opinion. *See* Fed. R.App. P. 19; 16 Charles A. Wright, Arthur R. Miller, Edward H. Cooper & Eugene Gressman, *Federal Practice & Procedure* § 3965 (1977). In *Hoffman,* though, no submission of a proposed judgment was required and a check of the Seventh

Circuit docket shows the judgment was entered the same day the opinion was issued.

2. The language of the Decree is the "proceedings related to any appeal ... are completed." This would seem to be different than the commonly used term when any appeal becomes "final." Even if "completed" should be construed as synonymous with the appeal being final, the latest the appeal became final was the day after 90 days after the July 19, 1993 judgment (Tuesday, October 19, 1993), by which time it would have been too late to file a certiorari petition. *See* 28 U.S.C. § 2101(c); Sup.Ct. R. 13.

oped into a housing subdivision known as "Victoria Crossings." In preparation for construction of Victoria Crossings, Hoffman filled and graded parts of the site, including an 0.8 acre, bowl-shaped depression at the northeast border of the site. Before it was filled by Hoffman, this small depression was lined with relatively impermeable clay so that rain water could not drain off quickly and would collect in the bottom. The EPA found that the bowl-shaped depression, known as "Area A," was an intrastate wetland. Area A had no surface or groundwater connection to any other body of water. It did not perform sediment trapping or flood control functions for any body of water, was not used for industrial or fishing purposes and was not visited by interstate travelers for recreational or other purposes. In fact, there is not even any evidence that migratory birds, or any other wildlife, actually used Area A for any purpose.

*Hoffman I,* 961 F.2d at 1311.

The parties agree that, as of 1990, W9 had standing water and little vegetation and that waterfowl had been observed using the area on each of four dates it was visited by EPA officials. Stip. Facts ¶ 19. It is also agreed that W9 "was an isolated area, not connected hydrologically to any other surface water area [and] not adjacent to any other surface water." *Id.* ¶¶ 22–23. The parties agree that, as of the time the Decree was signed, *Hoffman I* "arguably would not have permitted area W9 to be treated as a wetland." Stip. Facts ¶ 25.

The Clean Water Act requires a permit from the Secretary of the Army in order to discharge fill into "navigable waters." 33 U.S.C. § 1344(a). The Clean Water Act defines navigable waters as "the waters of the United States, including the territorial seas." *Id.* § 1362(7). Regulations of the EPA and Army Corps of Engineers define waters of the United States as including three types of wetlands: (a) interstate wetlands, (b) wetlands adjacent to other waters of the United States, and (c) intrastate wetlands whose use or misuse could affect interstate commerce. 40 C.F.R. § 230.3(s); 33 C.F.R. § 328.3(a); *Hoffman II,* 999 F.2d at 260. *See also Hoff-*

*man I,* 961 F.2d at 1312–13. Pertinent to this case and the *Hoffman* case, *see Hoffman I,* 961 F.2d at 1314 ("This case involves nonadjacent, or isolated, wetlands."), is the third type of wetland.

(3) All other waters such as intrastate lakes, rivers, streams (including intermittent streams), mudflats, sandflats, wetlands, sloughs, prairie potholes, wet meadows, playa lakes, or natural ponds, the use, degradation, or destruction of which could affect interstate or foreign commerce including any such waters:

(i) Which are or could be used by interstate or foreign travelers for recreational or other purposes; or

(ii) From which fish or shellfish are or could be taken and sold in interstate or foreign commerce; or

(iii) Which are used or could be used for industrial purposes by industries in interstate commerce.

40 C.F.R. § 230.3(s)(3).

*Hoffman I* holds that the EPA's definition of navigable waters as including isolated wetlands is unenforceable because inconsistent with the Clean Water Act. *Id.* at 1316. "Isolated wetlands, unlike adjacent wetlands, have no hydrological connection to any body of water. Thus, isolated wetlands, like Area A, are not part of an aquatic ecosystem and do not control floods or pollution in other bodies of water. Protection of isolated wetlands, therefore, would not further the objective of the Clean Water Act 'to restore and maintain the chemical, physical, and biological integrity of the Nation's waters.'" *Id.* at 1314.

*Hoffman I* went on to hold in the alternative that, even if the regulation was consistent with the Clean Water Act, such a provision could not be constitutionally enforced because it was beyond the powers of Congress under the Commerce Clause. *Id.* at 1316–21. The EPA argued that Area A was not beyond the regulatory limits of the Commerce Clause because migratory birds potentially could use the area. The Seventh Circuit, however, stated:

... Since creation (of the states), migratory birds have flown interstate. But this

annual traverse by itself does not affect commerce. The birds obviously do not engage in commerce. Until they are watched, photographed, shot at or otherwise impacted by people who do (or, we suppose, have the potential to) engage in interstate commerce, migratory birds do not ignite the Commerce Clause. The idea that the *potential* presence of migrating birds itself affects commerce is even more far-fetched.

No federal court has ever held that the mere presence of wildlife—actual or potential, interstate or intrastate—is enough to invoke the Commerce Clause power.

*Id.* at 1320.

The court concluded:

For the foregoing reasons, the petition for review of the final decision of the Environmental Protection Agency is GRANTED, and the EPA's order, as far as it requires Hoffman Homes to pay a $50,000 administrative penalty for the filling of Area A, is VACATED.

*Id.* at 1323.

The EPA petitioned for rehearing. The opinion in *Hoffman I* was vacated and subsequently a new opinion was issued reaching the same result, denying enforcement of the $50,000 administrative penalty for filling Area A. *Hoffman II*, 999 F.2d at 262. *Hoffman II*, however, relied on different grounds than *Hoffman I*. *Hoffman II* holds that the administrative finding that Area A was a suitable habitat for migratory birds was not supported by substantial evidence. *Hoffman II*, 999 F.2d at 262. With that fact issue resolved contrary to the final administrative determination of the EPA, Area A did not even qualify as a water of the United States under the EPA's isolated wetlands regulation. It was therefore unnecessary for the *Hoffman II* court to consider whether that regulation was consistent with the statute or within the limits of the Commerce Clause. The majority opinion does not address those issues. (Judge Manion's concurring opinion, however, readopts the reasoning of *Hoffman I. See Hoffman II*, 999 F.2d at 262–63 (Manion, J., concurring).)

The government contends *Hoffman II*, 999 F.2d at 261, "effectively" holds that the regulations as written are enforceable. *See* Pl. Proposed Conclusions of Law ¶ 45. That is not true. *Hoffman II* only concludes that the *regulations* provide that possible use of wetlands by migratory birds is an adequate connection to interstate commerce and that the EPA's Chief Judicial Officer (the administrative decisionmaker) could so construe the regulations. Since there was no use of Area A by migratory birds, *Hoffman II* does not address whether the regulations are a proper interpretation of the statute or constitutionally enforceable.

The government also points to dictum in *Rueth v. United States EPA*, 13 F.3d 227, 231 (7th Cir.1993), that *Hoffman II* "makes clear ... nearly all wetlands fall within the jurisdiction of the [Clean Water Act] since one test for whether the wetland affects interstate commerce is whether migratory birds use the wetland ... giv[ing] full effect to Congress's intent to make the Clean Water Act as far-reaching as the Commerce Clause permits." *Rueth* apparently looked only to *Hoffman II, Hoffman I* having been vacated and only being pertinent to the present case because referenced in the Decree. *Rueth* does not discuss the questions of whether the regulation is consistent with the Clean Water Act or the Commerce Clause, which were the issues in *Hoffman I* pertinent to the present case. In any event, a direct examination of *Hoffman II* shows it does not reach issues reached in *Hoffman I* that were pertinent to the Decree in the present case. *Dictum* in *Rueth* that does not directly consider the differences between *Hoffman I* and *Hoffman II* nor discuss the pertinent issues does not bind this court to conclude otherwise regarding whether *Hoffman II* reversed *Hoffman I.*

*Hoffman II* concludes:

Almost one hundred years ago the Supreme Court characterized wetlands as "the cause of malarial and malignant fevers" and opined that "the police power is never more legitimately exercised than in removing such nuisances." *Leovy v. United States*, 177 U.S. 621, 636, 20 S.Ct. 797, 803, 44 L.Ed. 914 (1900). We know now

that wetlands are not nuisances but instead are vital to the well-being of both humans and wildlife. Nonetheless, it is our conclusion based on the particular facts and findings below that Area A is not subject to regulation under the Clean Water Act. For this reason we vacate the EPA's order requiring Hoffman Homes, Inc. to pay a $50,000 administrative penalty for the filling of Area A.

VACATED.

*Hoffman II*, 999 F.2d at 262.

The government contends that vacating *Hoffman I* for rehearing satisfies the "reversed" requirement of ¶ 20A of the Decree even though *Hoffman II* does not reach any contrary conclusions on the "pertinent portions" of *Hoffman I*.

Paragraph 20A contains imprecise language. First, it refers to the mandate issuing in *Hoffman I*, even though *Hoffman I* is an appeal involving direct administrative review in which judgments are entered and closing orders issued, but no mandate is issued.[3] Second, although a petition for rehearing had been granted in *Hoffman* prior to entry of the Decree,[4] ¶ 20A makes no express reference to rehearing, referring only to "any appeal, petition for certiorari, or remand" and *Hoffman I* being "reversed," a term that generally refers to an action by a higher court, not an action by the same court. *See Black's Law Dictionary* 1319 (6th ed.1990).

■ Extrinsic evidence may be considered in resolving ambiguities in consent decrees, *see Goluba v. School District of Ripon*, 45 F.3d 1035, 1038 (7th Cir.1995); *United States v. City of Northlake, Ill.*, 942 F.2d 1164, 1167–68 (7th Cir.1991); *South v. Rowe*, 759 F.2d 610, 613 (7th Cir.1985), but the parties point to no possible extrinsic evidence other than the obvious fact that ¶ 20A was intended

to resolve conflicts regarding the possible application of the *Hoffman I* holding to disputes regarding whether W9 was a water of the United States.

■ In the ordinary sense, reverse means to "turn completely about in position or direction," to be "opposite or contrary to a previous or normal position." *Webster's Ninth New Collegiate Dictionary* 1009 (1988). In the legal sense, it has been defined as: "To overthrow, vacate, set aside, make void, annul, repeal, or revoke; as, to reverse a judgment, sentence or decree of a lower court by an appellate court, or to change to the contrary or to a former condition. To reverse a judgment means to overthrow it by contrary decision, make it void, undo or annul it for error." *Black's* at 1319. *See also Atlantic Coast Line R.R. Co. v. St. Joe Paper Co.*, 216 F.2d 832, 833 (5th Cir. 1954), *cert. denied*, 348 U.S. 963, 75 S.Ct. 522, 523, 524, 99 L.Ed. 750, 751 (1955). "Vacate" has been defined as: "To annul; to set aside; to cancel stop or rescind. To render an act void; as to vacate an entry of record, or a judgment." *Black's* at 1548.

■ Paragraph 20A must be construed in context, keeping in mind the parties' purposes and intent. *See White v. Roughton*, 689 F.2d 118, 120 (7th Cir.1982), *cert. denied*, 460 U.S. 1070, 103 S.Ct. 1524, 75 L.Ed.2d 947 (1983); *Eliasen v. Itel Corp.*, 883 F.Supp. 280, 289 (N.D.Ill.1995), *aff'd*, 82 F.3d 731, 735–36 (7th Cir.1996); *International Union, United Automobile, Aerospace and Agricultural Implement Workers of America, Local 59 v. Stanadyne, Inc.*, 1989 WL 84453 *2 (N.D.Ill. July 19, 1989). *Hoffman I* holds that isolated wetlands are not within the purview of the Clean Water Act. With that precedent intact, the EPA had no basis for contending W9 was a water of the United States. Defendants, therefore, had the more favorable position in negotiations on this is-

---

**3.** If ¶ 20A is construed literally, W9 is still to be considered a water of the United States because a mandate in *Hoffman* has never been issued and never will be. As discussed above, mandate should be understood to mean either the closing order or judgment, both of which came well before W9 was filled. Neither side makes a contrary contention.

**4.** The agreement of the parties as to the proposed Decree was reached prior to rehearing being granted in *Hoffman I*. The parties, however, were not precluded from seeking to amend the decree prior to entry. Moreover, even though not yet granted, the motion for rehearing was pending at the time the parties reached their agreement. A better crafted document would have made reference to the possibility of a rehearing.

sue. There was, however, the possibility that Hoffman I would be reversed. Under the government's proposed construction, defendants not only would have agreed to continue to treat W9 as a water of the United States during appeals of that case [5] and to not treat it as so if the case were subsequently reversed, but also agreed that ultimately were there to be no decision on the pertinent issues (which is what happened in *Hoffman II*), plaintiff would be accorded the benefit of a nondecision despite defendants having the upper hand in negotiations and there still being prior indication that the Seventh Circuit would rule in defendants' favor if it had to reach the issue. That is not what one would expect to result from the arm's length negotiations that preceded the Decree. One would expect that defendants would be left in their favorable position as long as there was no decision holding the regulation was enforceable and isolated wetlands were therefore within the enforceable purview of the Clean Water Act and governed by the permit requirements.

■ In any event, "reversed" should be understood as reaching a contrary position. Although the vacating of decisions is sometimes understood to be a reversal, that would be in situations where vacating a decision has the effect of producing a contrary result or position change. For example, in Hoffman, the vacating of the EPA Administrator's imposition of a penalty was a reversal of that penalty. That is not what happened when the Seventh Circuit vacated *Hoffman I*—the Seventh Circuit did not thereby change its decision to an affirmance of the imposition of the penalty, it simply left the decision for another day. The government was hoping for a ruling, within the limited time period and context of the life of the *Hoffman* case, [6] that isolated wetlands were within the coverage of the Clean Water Act. It received no such ruling—there was only a decision reaffirming the result of *Hoffman I*. Moreover, if (as the government contends) merely vacating *Hoffman I* satisfies the "reversed" re-

quirement, the requirement would have been satisfied almost two months before entry of the Decree when the Seventh Circuit granted the rehearing. If ¶ 20A were to be construed as including the vacating of the opinion as a reversal, most of ¶ 20A's provisions would be rendered without effect since the opinion had been vacated before entry of the Decree. Consent decree language, like contracts and statutes, should not be so construed. *See Mastrobuono v. Shearson Lehman Hutton, Inc.*, 514 U.S. 52, ——, 115 S.Ct. 1212, 1219, 131 L.Ed.2d 76 (1995). The pertinent issues of *Hoffman I* were not reversed when it was vacated for rehearing and the Seventh Circuit subsequently entered a new opinion (never appealed) reaching no decision on those issues.

Since *Hoffman I* was not reversed, under the Decree W9 was not a water of the United States subject to the requirements of ¶ 17 of the Decree nor the Decree's penalty provisions for discharging fill without a permit. The government's motion will be denied to the extent it seeks to impose a penalty under the Decree for filling W9.

## II. *3.10 ACRE LAKE*

Incorporated into the Decree, by agreement of the government, was a mitigation plan developed by defendants' consultants. Stip. Facts ¶ 33. The Decree sets forth the following deadlines:

| Deadline: | Task: |
| --- | --- |
| March 1, 1993 | Commence initial excavation and grading. |
| March 31, 1993 | Complete initial excavation and grading, and complete installation of flow control structures. |
| May 15, 1993 | Complete planting in the mitigation area. |

Decree ¶ 30. It is undisputed that defendants satisfied the first deadline. Stip. Facts ¶ 46. Defendants concede they did not satisfy the latter two deadlines. *See* Def. Proposed Findings ¶ 31. It is undisputed that the deadlines contained in the Decree were

---

**5.** A concession on defendants' part, but an understandable one in that it preserved the status quo.

**6.** The parties did not include overruling of *Hoffman* by another case as a basis for treating W9 as a water of the United States. *See In re Adebanjo*, 165 B.R. 98, 102 (Bankr.D.Conn.1994) (distinguishing reversal and overruling).

missed by at least 523 days and that the Decree provides for a stipulated penalty of $2,500 per day (Decree ¶ 55(b)) which would total $1,307,500 for a 523–day delay.

Defendants raise various arguments as to why they should not be penalized for failing to meet the stated deadlines. They contend the deadlines were modified by the parties' course of dealing in implementing the Decree, or that the course of dealing resulted in the government waiving its right to damages for missing the deadlines. Alternatively, defendants contend that the stipulated penalties are unenforceable because unconscionably high or should be lessened in light of the actual violation.

The Decree provides in part:

77. This Consent Decree contains the entire agreement between the parties, and no statements or promises made by any party or its agent that are not contained in this Decree shall be valid or binding.

\* \* \* \* \* \*

79. Any modification of this Consent Decree shall be in writing and approved by this Court, except that the parties may extend deadlines in accordance with Parts X and XI (force majeure and dispute resolution) without further approval of the Court.

Decree ¶ ¶ 77, 79. There is no contention that, even ignoring the writing requirements also contained in Parts X and XI, a modification of the deadline was obtained in accordance with ¶ 79. Neither do defendants contend that, the parties having exhausted their dispute resolution procedures, the court can find a basis under the *force majeure* provision for extending the deadline.

Although defendants make arguments that Illinois law applies to the interpretation of the decree and that Illinois law permits oral modifications despite express contractual provisions to the contrary, defendants point to no oral agreement to modify the deadline. They point only to offers involving extensions that were never accepted because the parties could not agree on other issues that were part of the same offers. Instead, defendants primarily contend the deadlines were extended by a course of dealing in which the government agreed to or acquiesced in changes to the mitigation plan, or at least that the government's conduct constituted a waiver of the deadlines.

Defendants, however, do not contend there is any evidence that the government acquiesced in the extension of any deadlines, only that it acquiesced in changing the mitigation plan. Moreover, it is undisputed that the government repeatedly took the position that the deadlines had not been satisfied and a penalty was due. The government took this position both before and after the March 31 and May 15, 1993 deadlines. See Stip. Facts ¶ ¶ 44 (3/93), 56–57 (4/2/93), 59 (4/9/93), 63 (4/16/93), 68 (5/5/93), 70 (5/21/93), 88 (10/21/93), 96 (11/30/93). In light of those undisputed facts, defendants cannot possibly show that the deadline was changed by a course of dealing or waived by the government's conduct in acquiescing in some changes to the mitigation plan.

Citing to Illinois law, *see Lake River Corp. v. Carborundum Co.,* 769 F.2d 1284, 1289–90 (7th Cir.1985), defendants contend the stipulated penalties under the contract are an unenforceable penalty unrelated to actual damages or an estimate of damages that could have been made at the time the parties agreed to the Decree. Def. Prop. Conclusions of Law ¶ 77. This is an odd argument to make in that the parties were not seeking to liquidate damages, but instead were reaching a compromise regarding possible statutory penalties. The Clean Water Act provides for penalties of up to $25,000 per day. 33 U.S.C. § 1319(d). Therefore, it would not be unconscionable or otherwise inappropriate to have a provision that imposes a penalty.

Even if there were a rule that any "liquidated penalties" contained in a consent decree be a reasonable estimate of possible penalties to be imposed, the $2,500 per day penalty would not be unenforceable. That is one-tenth of the maximum penalty of $25,000 per day. The statute provides: "In determining the amount of civil penalty the court shall consider the seriousness of the violation or violations, the economic benefit (if any) resulting from the violation, any history of

such violations, any good-faith efforts to comply with the applicable requirements, the economic impact of the penalty on the violator, and such other matters as justice might require." 33 U.S.C. § 1319(d).

Defendants contend the violations were not significant because they should still be able to meet the final deadline for completing the mitigation work. They also contend that the economic benefit to them was a saving of only $11,900. Further, they contend that they have acted in good-faith, had some problems with the weather, and had expected to obtain an agreed upon extension. It should also be noted that defendants had some prior history of filling wetlands without a permit, which is why they entered into the Decree and agreed to perform the mitigation.

■ The traditional rule for distinguishing liquidated damages from an unenforceable penalty would not take defendants' claimed mitigating factors into account. Whether a contractual provision is a penalty is not measured against the actual damages that occurred, it is measured against an estimate of possible damages made at the time of contracting and whether that estimate exceeds a reasonable *upper* estimate of potential damages.[7] *See Lake River,* 769 F.2d at 1289–90. Therefore the question would be whether it would be reasonable to impose a $2,500 per day penalty for bad faith delays that delay the entire project and saved defendants substantial funds. Such a penalty would not be excessive. Moreover, even if the facts that defendants point to are assumed to be true and should be considered, the penalty provision would not be an excessive estimate. *Compare Hawaii's Thousand Friends v. City & County of Honolulu,* 821 F.Supp. 1368, 1397 (D.Haw.1993) ($6,000 per violation penalty totalling $312,000 against a municipality for failing to satisfy reporting

provisions where there was a lack of quantifiable harm and an absence of economic benefit to the violator); *United States v. Key West Towers, Inc.,* 720 F.Supp. 963 (S.D.Fla. 1989) (imposing $250,000 penalty, which was 10% of the maximum allowable penalty, for time period during which wetland was improperly filled where violator had little economic benefit but acted in bad faith in committing a serious violation). *Compare also United States v. National Steel Corp.,* 767 F.2d 1176, 1178 (6th Cir.1985) (stipulated penalty under consent decree of $7,500 per day for failing to install pollution control equipment by date set forth in decree);[8] *United States v. Kelley,* 145 F.R.D. 432, 436 (E.D.Mich.1993) (stipulated penalty under consent decree of $3,000 per day for failing to monitor air quality); *Thousand Friends,* 821 F.Supp. at 1396–97 ($3,000 per violation penalty totaling $156,000 against a municipality for bypassing secondary treatment requirements where there was a lack of quantifiable harm, an absence of economic benefit to the violator, and limited good faith efforts). Other cases impose lower per day penalties, but not so low that $2,500 per day must be held to be an unreasonably excessive estimate of a difficult to quantify penalty. *See, e.g., Atlantic States Legal Foundation Inc. v. Universal Tool & Stamping Co.,* 786 F.Supp. 743, 753–54 (N.D.Ind.1992) ($450,000 penalty for 1,977 violations of exceeding discharge limits of permit where there was minimal environmental damage, $85,000 of economic benefit to the violator, good faith efforts, and possible economic hardship to the violator)[9]; *United States v. City of Beaumont,* 786 F.Supp. 634 (E.D.Tex.1992) ($500 per day violation totalling $400,000 for 800–day delay in implementing required pretreatment program where economic benefit was $316,000

---

7. The traditional rule also requires that the damages will likely be difficult to measure. *See Lake River,* 769 F.2d at 1289. That requirement would be satisfied here since there is no clear measure of the appropriate penalties to impose under § 1319(d). *See United States v. Kelley,* 145 F.R.D. 432, 436 (E.D.Mich.1993). *Cf. Commissioner of Environmental Protection v. Connecticut Building Wrecking Co.,* 227 Conn. 175, 629 A.2d 1116, 1122 (1993) (discussing state environmen-

tal statute with nearly identical penalty provision).

8. At that time, the maximum penalty was $10,-000 per day. The limit was not raised to $25,000 until 1987.

9. During part of the applicable time period, the statutory limit was $10,000 per day.

and there may have been significant pollution).[10]

Defendants do not point to evidence supporting that the Decree's $2,500 per day penalty for failure to satisfy ¶ 30's deadlines is an unreasonably excessive penalty.

Since the penalty the government seeks to enforce is not excessive, it is unnecessary to determine whether federal common law would prohibit the enforcement of a penalty provision of the Decree if the penalty were excessive. It is noted, though, that at least one Seventh Circuit case has questioned the wisdom of refusing to enforce contractual penalties agreed upon by sophisticated parties represented by counsel, as was the situation in the present case. *See Lake River,* 769 F.2d at 1289 (Posner, J.).[11] *See also Pace Communications, Inc. v. Moonlight Design, Inc.,* 31 F.3d 587, 593 (7th Cir.1994) (Cudahy, J.).

There being an enforceable penalty contained in the Decree, there is no basis for this court independently determining an appropriate penalty. Defendants' arguments that this court should determine an appropriate penalty of a lesser amount will not be considered.

IT IS THEREFORE ORDERED that plaintiff's motion to enforce the consent decree [8–1] is granted in part and denied in part. The Clerk of the Court is directed to enter judgment in favor of plaintiff United States and against defendants Robert R. Krilich, Krilich Companies, Inc., and Riverwoods Development Corp. jointly and severally in the amount of $1,307,500.

## MEMORANDUM OPINION AND ORDER ON RECONSIDERATION

In 1992, the parties in this case entered into a consent decree (the "Decree") that was approved by the court. Approximately three years after the decree was entered, the government moved for enforcement of two provisions contained in the Decree. Defendants answered that motion and also filed a surreply to the government's reply. From an initial examination of those briefs, it appeared there were material disputed facts that would require a hearing and the parties were ordered to file a stipulation of uncontested facts, a statement of contested facts, and proposed findings of fact and conclusions of law. The government did not file a statement of contested facts and represented at a status hearing that it did not believe any further hearing was required because any contested facts were immaterial to the issues before the court. No party objected to the court's statement that it would examine the briefs on the motion and the additional filings to determine what issues, if any, required a hearing on contested facts. No party complained that it had not had an opportunity to place all possible issues and arguments before the court.[1] Following examination of the parties' filings, it was held that no material factual dispute existed and that the government was entitled to penalties on only one of the two grounds it raised. *See United States v. Krilich,* 948 F.Supp. 719, 720–28 (N.D.Ill.1996) (*"Krilich I"*). Defendants timely moved for reconsideration of the holding that the government was entitled to penalties totaling $1,307,500 for a 523–day delay in meeting deadlines set forth in § 30 of the Decree. *See Krilich I,* 948 F.Supp. at 725–28. Familiarity with *Krilich I* is presumed.

It is undisputed that defendants missed certain deadlines contained in ¶ 30 of the

---

**10.** During the entire time period, the statutory limit was $10,000 per day.

**11.** *Lake River* questions the policy of applying this rule to contracts negotiated by large corporations, but applies the rule in that case because governed by Illinois law, not federal common law.

**1.** Defendants' present contention that the court's ruling caught them by surprise and that they did not have an opportunity to address all issues is without basis in fact. Also, their statement in footnote 2 of their supporting memorandum misstates *Krilich I.* There is no finding in *Krilich I,* 948 F.Supp. at 727 that defendants actually saved substantial funds. To the contrary, the actual facts were assumed to be that defendants saved only $11,900, which is why most of the cases cited for comparison were ones in which the violator had little economic benefit. *See id.* The saving of substantial funds was simply an assumption that would be made in making a reasonable upper estimate of potential penalties at the time of contracting. *See id.*

Decree. It is also undisputed that the parties agreed to changes in the actual mitigation work to be done. The disputed legal question is defendants' obligation to pay penalties because the deadlines in the Decree were not satisfied. In their response to the government's motion and in their proposed conclusions of law, defendants made a number of arguments. They contended the deadlines should be considered to be modified based on the course of dealing modifying the mitigation plan or waived by this course of dealing. Alternatively, it was contended the stipulated penalties were an unenforceable liquidated penalties provision of a contract or at least that the penalties should be limited to an amount commensurate with the actual violation that occurred. *Krilich I*, 948 F.Supp. at 726–28 rejects each of these arguments. On the other issue raised by the government, it was held that an area known as W9 was not a wetland under the terms of the Decree and therefore defendants did not violate the Decree by filling W9. *See Krilich I*, 948 F.Supp. at 721–25.

At various points before the government returned to court to seek enforcement of the Decree's penalty provisions, the parties sought to reach a compromise on defendants' violations of the Decree. As part of a proposed settlement, the government had been willing to accept $150,000 in penalties for violation of the deadlines and a new schedule for the revised mitigation plan. However, the parties could not agree on a resolution of the W9 issues (and possibly other issues as well) and no new schedule or penalty amount was ever agreed upon. Defendants contend they could prove that the government would have accepted the $150,000 penalty and new schedule if not for its view that W9 was a wetland under the terms of the Decree. Defendants contend a hearing on this factual contention is necessary because, accepting this contention as true, defendants argue that the government should be forced to accept the $150,000/new schedule proposal because *Krilich I* holds that the government was incorrect as to W9.

Defendants, of course, cite no legal support for their argument that once one part of a proposed settlement of a legal dispute is ruled upon on the merits, the party that lost the first part on the merits is obliged to accept the other part of the proposal. The parties did not reach an accord on the deadline issue while leaving the W9 issue to be resolved separately; they reached no accord on either issue. There is no basis for requiring the government to accept a prior proposal on the deadline issue because a subsequent ruling on the merits of the W9 issue went against the government. Defendants' motion for reconsideration will be denied.

IT IS THEREFORE ORDERED that defendant's motion to alter or amend judgment [42–1,2] is denied.